Abbas Kazerounian, Esq. (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Ave, Suite D1
Costa Mesa, CA 92626
ak@kazlg.com
(800) 400-6808; Fax 1-800-520-5523

Theodore O. Bartholow, III (*pro hac vice*)
KELLETT & BARTHOLOW PLLC
11300 N. Central Expy., Suite 301
Dallas, TX 75243
thad@kblawtx.com
(214) 696-9000; Fax (214) 696-9001

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD J. PATTERSON; JOSHUA P. ADAMS; LINDA G. JORDAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & CO.; WELLS FARGO BANK, N.A.; EARLY WARNING SERVICES, LLC; LEXISNEXIS RISK SOLUTIONS INC.,<br><br>Defendants. | Case No.: 3:23-cv-03858-TLT<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**<br><br>1) **THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;**<br>2) **THE ELECTRONIC FUNDS TRANSFER ACT;**<br>3) **THE FAIR CREDIT REPORTING ACT;**<br>4) **THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT;**<br>5) **NEGLIGENCE / GROSS NEGLIGENCE.**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Bernard J. Patterson ("Patterson"), Joshua P. Adams ("Adams"), and Linda G. Jordan ("Jordan") (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action complaint against Defendants Wells Fargo & Co. ("WFC"), Wells Fargo Bank, N.A. ("WFB") (WFC together with WFB shall be referred to as "Wells Fargo"), LexisNexis Risk Solutions Inc. ("LNRS"), and Early Warning Services, LLC ("Early Warning") (collectively, the "Defendants"), and allege as follows:

## I. INTRODUCTION

1.  Just as one Wells Fargo fake account scandal concludes, another emerges. This time, Defendants are engaging in and/or enabling a practice known as synthetic identity fraud, which is where fraudsters (with Defendants' witting or unwitting assistance) use a combination of fake and real personal identification information ("PII") to open unauthorized accounts in their consumer victims' names. With these unauthorized accounts thus opened, Wells Fargo secretly processes unauthorized electronic fund transfer transactions in victims' names using these unauthorized accounts (money laundering), and, with assistance from Early Warning, Wells Fargo also fraudulently obtains its victims' valuable true and correct personal identification and personal financial information ("PFI").

2.  The victims' PFI that Wells Fargo fraudulently obtains through this scheme can include the most private, sensitive, and valuable financial information a consumer has – it literally includes the victims' entire personal banking balance and transaction history for every reported bank account, as well as full account numbers, account open and close dates, and all of the detailed PII each of the victims' banks associate with each account. It is everything necessary to steal a person's financial identity, and ultimately, it is everything necessary to steal everything the unwitting victims have in their legitimate bank accounts.

## II. PARTIES

3.  Patterson, a natural person, is a resident of the state of Arkansas. Patterson works as a forensic accounting expert specializing in mortgage servicing-related accounting issues. He has provided expert services in hundreds of litigated matters in courts throughout the United States,

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

including numerous cases involving Wells Fargo's mortgage servicing business. Because of the nature of his work, Patterson has consciously avoided opening bank accounts with financial institutions – like Wells Fargo – that are engaged in the mortgage servicing business.

4.  Adams, a natural person, is a resident of the state of West Virginia. Adams has never applied for, opened, or held any account with Wells Fargo due, in part, to the lack of Wells Fargo-operated bank branches in his area.

5.  Jordan, a natural person, is a resident of the state of California. Jordan, like the other Plaintiffs, never applied for, opened, or held any account with Wells Fargo.

6.  WFC is a diversified financial services company headquartered in San Francisco, California. WFC provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.  WFC may be served through its registered agent, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, CA 95833.

7.  WFC exercises specific and financial control over the operations of WFB; dictates the policies, procedures, and practices of WFB; and WFC exercises power and control over the specific activities upon which the claims herein are based.

8.  WFB is a national banking association that is WFC's principal subsidiary.  While WFB's designated "headquarters" (for purposes of the National Bank Act) is in Sioux Falls, South Dakota, WFB's actual principal place of business is in San Francisco, California. WFB is also one of seven U.S. Banks that founded and own Early Warning.  WFB may be served through Corporation Service Company d/b/a CSC-Lawyers Incorporation Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833. Among other things, WFB provides personal and commercial banking services.

9.  LNRS is a multinational corporation headquartered in Alpharetta, Georgia. LNRS is a "consumer reporting agency" as defined in 15 U.S.C. 1681(a)(d) which regularly engages in the business of assembling, evaluating, and providing "consumer reports" to third parties as defined

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

by 15 U.S.C. 1681(a)(d). LNRS may be served with process via its registered agent, C T Corporation System, 330 North Brand Boulevard, Suite 700, Glendale, CA 91203.

10.    Early Warning is a Delaware limited liability corporation, which may be served with process via its registered agent, Cogency Global, Inc., 1325 J Street, Suite 1550, Sacramento, CA 95814. Early Warning is a business that Wells Fargo and the nation's six other largest banks collectively established and continue to collectively own and operate.

11.    Early Warning's foundational business is a specialty credit reporting agency that collects and publishes detailed "tradeline" information[1] regarding consumers' personal and business bank accounts, leveraging the vast database of PII it obtains from financial institutions that furnish consumer tradeline information to it, Early Warning provides identity verification services to banks and other financial service businesses when they open new consumer accounts, acts as an information security service provider specializing in identification and prevention of identity fraud, and owns and operates the well-known peer-to-peer electronic funds transfer system, "Zelle."

### III. JURISDICTION AND VENUE

12.    The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), and the Fair Credit Reporting Act, ("FCRA") 15 U.S.C. § 1681.

13.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant.  On information and belief, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

---

[1] "A tradeline is information about a consumer account that is sent . . . to a consumer reporting agency. Tradelines contain data such as the account balance, payment history, and the status of the account[.]" Consumer Financial Protection Bureau, Market Snapshot: Third-Party Debt Collections Tradeline Reporting (July 2019), https://files.consumerfinance.gov/f/documents/201907_cfpb_third-party-debt-collections_report.pdf.

14.    The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

15.    This Court has general personal jurisdiction over WFB because its principal place of business is in San Francisco, California.

16.    This Court has general personal jurisdiction over WFC because its principal place of business is in San Francisco, California.

17.    This Court also has general personal jurisdiction over WFB because its contacts with California are so constant and pervasive as to render it essentially at home in California.

18.    This Court also has general personal jurisdiction over WFC because its contacts with California are so constant and pervasive as to render it essentially at home in California.

19.    The exercise of specific personal jurisdiction over all Defendants is consistent with due process, as all Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from services provided to, persons in this District and in California.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has jurisdiction over Defendants, and Defendants have sufficient contacts with this District, the situs of Wells Fargo's principal place of business.

21.    Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

## IV.  INTRADISTRICT ASSIGNMENT

22.    Because Wells Fargo's principal place of business is in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the United States District Court for the Northern District of California.

//

//

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

## V.  FACTUAL ALLEGATIONS
### Summary of Defendants' Wrongdoing

23.    WFB opened unauthorized consumer checking accounts in victims' names without their knowledge or consent.[2] Many of Defendants' victims, including Plaintiffs, had no pre-existing business relationship with Wells Fargo.

24.    WFB uses Early Warning and/or LNRS to provide "identity verification" and/or "Know Your Customer"[3] services when it opens new consumer banking accounts.

25.    Early Warning and/or LNRS are able to provide identity verification services to Wells Fargo and other financial institutions because they are specialty consumer credit reporting agencies that collect and report consumers' detailed PII and PFI they obtain from their furnishers, which comprise virtually all of the nation's banks and credit unions.

26.    LNRS also frequently works with governmental and financial institutions[4], offering a range of services, including fraud prevention, identity authentication, and anti-money laundering compliance services.[5]

---

[2] The practices described herein are separate and distinct from Wells Fargo's well-documented and relatively recent so-called "sales practices" scandal, in which Wells Fargo's employees secretly opened consumer accounts for millions of existing Wells Fargo customers in order to meet unrealistic sales goals/requirements imposed upon them by Wells Fargo.

[3] Know Your Customer ("KYC") is a financial/investment industry standard for identity verification with three components: (1) customer identification program, (2) customer due diligence, and (3) enhanced due diligence. *See also* Financial Industry Regulatory Authority Rule 2090 (https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090).

[4] LNRS's corporate customers include "all of the top 50 U.S. banks." Letter from Andrew Smith obo LexisNexis Risk Solutions, Comment on CFPB's Request for Information Regarding Data Brokers (July 14, 2023), *available at* https://www.regulations.gov/comment/CFPB-2023-0020-3934.

[5] *Bankers Almanac Enhanced Due Diligence*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/bankers-almanac-enhanced-due-diligence (last visited Nov. 6, 2023); *Flex ID*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/flex-id (last visited Nov. 6, 2023); *FraudPoint*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/fraudpoint (last visited Nov. 6, 2023); *AML Insight*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/aml-insight (last visited Nov. 6, 2023); *Fraud Intelligence*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/lexisnexis-fraud-intelligence (last visited Nov. 6, 2023); *Risk Narrative*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/risknarrative (last visited Nov. 6, 2023); *RiskView*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/riskview (last visited Nov. 6, 2023); *InstantID*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/products/instantid (last visited Nov. 6, 2023). *See also* Letter from Andrew Smith obo LNRS, *supra* footnote 4.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

27.     Similarly, Early Warning offers "New Account Opening Capability Bundles" which include identity verification and fraud prevention services. Early Warning also markets these services to financial institutions (including its owner institutions) with claims that it can help "meet compliance requirements."[6]

28.     Early Warning knew that the PII associated with Wells Fargo's unauthorized bank accounts did not match the PII that Early Warning's other member institutions had furnished to Early Warning regarding the victims' legitimate bank accounts.

29.     Like Early Warning, LNRS also knew the PII that Wells Fargo provided did not match PII in its system for Plaintiffs.

30.     Yet, on information and belief, at Wells Fargo's request, Early Warning falsely "verified" Plaintiffs' and the other victims' identities in connection with Wells Fargo's opening of unauthorized consumer checking accounts in their names. Despite the inconsistencies in Plaintiffs' PII provided by Wells Fargo, EWS and LNRS both allowed Wells Fargo to obtain Plaintiffs' consumer reporting information.

31.     Once opened, these unauthorized consumer checking bank accounts were then used by WFB to process unauthorized financial transactions in the victims' names. WFB also reported these accounts to EWS.

32.     In Patterson's case, WFB transferred at least $4,992 to an unknown third party via ACH using the unauthorized account Wells Fargo opened in Patterson's name.

33.     Similarly, WFB sent Adams a statement for an unauthorized checking account with a starting balance of $195.40, a Monthly Service Fee subtraction of $10.00, and an ending balance of $185.40.

34.     WFB also sent Jordan a bank statement for an unauthorized checking account with a $0.00 balance.

---

[6] *Verify Identity*, EARLY WARNING, https://www.earlywarning.com/products/verify-identity (last visited Nov. 6, 2023); *Predict New Account Risk*, EARLY WARNING, https://www.earlywarning.com/products/predict-new-account-risk (last visited Nov. 6, 2023); *Expand Credit Insights*, EARLY WARNING, https://www.earlywarning.com/products/expand-credit-insights (last visited Nov. 6, 2023).

35. To this day, Patterson and Adams do not know what the source of this money was (who it belonged to) or how it came to be in their unauthorized Wells Fargo account.

36. Wells Fargo also used the existence of Plaintiffs' and its other victims' unauthorized consumer checking accounts as a pretext for fraudulently obtaining its victims' confidential PFI, PII, and other unauthorized confidential disclosures (a/k/a "credit reports") from Early Warning.

37. Because Early Warning's credit reports contain the victims' confidential PII furnished to Early Warning by its member institutions with respect to their customers' personal and business banking accounts, Wells Fargo was able to use the accounts it fraudulently opened in the victims' names using false PII to obtain the victims' true PII, as well as their detailed PFI, including years of transaction and balance history for its victims' reported accounts.

38. Then, despite having actual knowledge that the PII it associated with the victims' accounts was false and contradicted by the PII associated with the victims' other legitimate bank accounts included on Early Warning's consumer credit reports, Wells Fargo intentionally furnished false and defamatory trade line information to Early Warning regarding the unauthorized consumer checking accounts it opened in the victims' names.

39. In turn, despite knowing that the alleged PII associated with Wells Fargo's victims' accounts was false and contradicted by the PII furnished by the financial institutions where the victims maintained legitimate bank accounts, Early Warning repeatedly published this false and defamatory trade line information to third parties – including false PII and false PFI regarding account status, unauthorized transactions, and account balances – for the victims' unauthorized Wells Fargo accounts.

40. Even upon acknowledging that victims' accounts were opened fraudulently, Defendants have failed to inform the recipients of their previously published false and defamatory trade line information regarding the victims' unauthorized bank accounts that such information was false. To Plaintiffs' knowledge, to this day, these errors have not been cured.

41. Defendants worked together to effectuate this scheme, and they profited from this scheme.

\\

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

**Plaintiff Bernard J. Patterson's Experience**

42.    Without his prior knowledge or consent, on March 10, 2022, Wells Fargo opened a consumer checking account in Patterson's name.

43.    The personal identification information for Patterson that Wells Fargo associated with the unauthorized Patterson account included a combination of true PII (specifically his full name, address, and social security number), and false PII (including false birthday, telephone number, driver's license state, driver's license number, driver's license expiration date, and email address).

44.    On information and belief, in connection with opening the unauthorized Patterson account, Wells Fargo used Early Warning's and/or LNRS's identity verification services, and Early Warning and/or LNRS falsely "verified" Patterson's identity even though Wells Fargo provided demonstrably false non-public PII for Patterson, which was incompatible with the otherwise consistent and correct non-public PII furnished to Early Warning and/or LNRS as well as by the financial institutions where Patterson maintains and/or previously maintained legitimate bank accounts.

45.    At the time Wells Fargo opened the unauthorized Patterson account, Patterson's full name and address were publicly available through property tax records, court filings, and other official records.

46.    Of the true and correct PII Wells Fargo associated with the unauthorized Patterson account, only his social security number was (ostensibly) non-public information.

47.    However, according to the Identity theft Resource Center, in 2020 alone, there were 1,802 data breaches that have exposed at least 420,000,000 individuals' PII, with most breaches including full social security numbers.[7] The PII mined from these data breaches is frequently for sale on dark web marketplaces.[8]

48.    Patterson did not provide Wells Fargo with any of his confidential PII.

---

[7] IDENTITY THEFT RESOURCE CENTER, 2022 Data Breach Report (Jan. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf.

[8] FED. RESERVE, Mitigating Synthetic Identity Fraud in the U.S. Payment System (July 2020), at p. 4.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

49.   Patterson did not want a bank account with Wells Fargo and did not request or authorize anyone to request that Wells Fargo set up a bank account in his name.

50.   Patterson has never previously opened a checking account with Wells Fargo, and at the time that Wells Fargo opened the unauthorized Patterson account, Patterson had no pre-existing business relationship with Wells Fargo.

51.   On March 10, 2022, the day when Wells Fargo initially opened the unauthorized Patterson account, Wells Fargo used Early Warning and/or LNRS to provide so-called "identity verification" services in connection with opening the fraudulent Patterson account.

52.   On March 11, 2022, the day after Wells Fargo initially opened the unauthorized Patterson account, Wells Fargo obtained Early Warning's credit report for Patterson, also without Patterson's knowledge or consent.

53.   Wells Fargo had no right to obtain Patterson's Early Warning credit report, and Early Warning had no reason to believe that Wells Fargo had a right to obtain Patterson's Early Warning credit report.

54.   Early Warning's credit report for Patterson includes trade lines for all of Patterson's business and personal bank accounts. Each of these trade lines includes current and historical balance and transaction information for each of the relevant accounts, which is information Patterson's banks regularly furnish to Early Warning. Each of these trade lines also includes Patterson's PII, which is also furnished to Early Warning by Patterson's banks. Other than the trade line for Wells Fargo's unauthorized Patterson account, the trade lines on Patterson's Early Warning credit report contain accurate PII for Patterson.

55.   While not all the trade lines on Patterson's Early Warning report include Patterson's driver's license information, the trade lines on his Early Warning credit report that did include Patterson's driver's license information were accurate and incompatible with the information provided by Wells Fargo for the Patterson unauthorized account.

56.   Patterson never put money into or withdrew money out of Wells Fargo's unauthorized Patterson account.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

57. On June 17, 2022, more than three months after Wells Fargo opened the unauthorized Patterson account, Patterson received his first monthly checking account statement from Wells Fargo for the unauthorized Patterson account. Wells Fargo's statement is dated June 7, 2022. This was the first time that Patterson had any knowledge about Wells Fargo's unauthorized Patterson account.

58. Patterson and his wife were in the process of obtaining a mortgage for the purchase of a home in Arkansas prior to and around the same time that he became aware that Wells Fargo opened the unauthorized bank account in his name. Indeed, Wells Fargo's statements for the unauthorized Patterson account advertised Wells Fargo's mortgage loan products.

59. This June 7, 2022, statement from Wells Fargo for the unauthorized Patterson account listed a balance of $12.00 in the account. The June 7, 2022, statement for the unauthorized Patterson account did not include information that would explain when or how the $12.00 balance came to be in the unauthorized Patterson account, and it did not reveal any prior transaction activity on the account.

60. Within approximately 20 minutes of opening his mail to discover Wells Fargo's June 7, 2022, statement for the unauthorized account, Patterson contacted Wells Fargo by telephone to try to find out what was going on / why he received a statement for a bank account he never opened.

61. Patterson navigated Wells Fargo's interactive voice response ("IVR") pre-recorded telephone message tree to request customer service and, after spending a while on hold, Patterson eventually was able to speak with a Wells Fargo representative.

62. After providing his name and the account number for the Wells Fargo unauthorized Patterson account to the Wells Fargo representative, Patterson informed the representative that he in fact had no account with Wells Fargo and never has had an account with Wells Fargo.

63. After hearing this, the Wells Fargo representative would only tell Patterson that the account was opened in March of 2022, before transferring Patterson to another Wells Fargo representative.

64. The second Wells Fargo representative with whom Patterson spoke on his June 17, 2022, telephone call with Wells Fargo informed Patterson that Wells Fargo would "put a freeze" on

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

the account. The purpose or alleged effect of this "freeze" on Wells Fargo's unauthorized Patterson account was not explained to Patterson, and the second Wells Fargo representative indicated that she was unable to tell Patterson anything else about the unauthorized bank account Wells Fargo had opened in his name.

65. Wells Fargo sent Patterson a letter dated June 24, 2022, in which Wells Fargo confirmed that Mr. Patterson did not open or have knowledge of any account with Wells Fargo.

66. Concerned that the unauthorized account Wells Fargo opened in his name could be a sign that he was the victim of identity fraud and that he was therefore at risk of incurring financial losses as a result, Patterson pulled his credit reports from Experian, Equifax, and Transunion, the "big three" consumer credit reporting agencies, on June 17, 2022.

67. None of Patterson's June 17, 2022, Experian, Equifax, or Transunion credit reports revealed any new account with Wells Fargo or any other new account or suspicious transaction activity.

68. Patterson's PII on each of these reports was, however, true and correct – and thus contrary to most of the PII associated with Wells Fargo's unauthorized Patterson account.

69. Patterson then pulled his credit report from ChexSystems, a consumer credit reporting agency specializing in reporting consumers' checking account usage, which also contained no reference to Wells Fargo's unauthorized Patterson account.

70. On August 2, 2022, Patterson pulled his credit report from Early Warning, which he had identified as a specialty credit reporting agency and identity verification service provider that Wells Fargo uses to "verify" new customer identities when opening consumer banking accounts and to whom Wells Fargo reports information regarding consumers' personal and business bank accounts.

71. Patterson's August 2, 2022, Early Warning credit report includes years of his historical personal and business banking transactions and account balances, all of which is valuable consumer data for Wells Fargo, which specializes in marketing its financial products to consumers based on the products Wells Fargo anticipates its customers will need based on their financial circumstances.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

72.   The Early Warning report also provides detailed account information and account status information for every reported consumer or business bank account associated with the consumer. This includes the bank name, bank routing number, account number, account open date, current account balance and status, previous account balances, date of last status change, and account status history. If the consumer has had any transactions refused due to insufficient funds, these are also reported on the Early Warning report, as well as dates, amounts, and recipient banks for all payments from each of the consumer's bank accounts.

73.   For each consumer or business bank account, Early Warning's banking report also includes detailed PII for the consumer, including their name, phone number, address, social security number, date of birth, email addresses, and in some cases, the form of identification reviewed by the bank, including the consumer's driver's license number, issuing state, and expiration date.

74.   Patterson's Early Warning report dated August 2, 2022, revealed that, without Patterson's knowledge or consent, *months prior to sending Patterson the June 7, 2022, statement*, Wells Fargo had in fact processed four ACH transactions using the unauthorized Patterson account. None of these transactions were disclosed or referenced on the June 7, 2022, Wells Fargo account statement for the unauthorized Patterson account, and Patterson had no prior knowledge of these transactions before he received the August 2, 2022, Early Warning report.

75.   Patterson's Early Warning report revealed that, without Mr. Patterson's knowledge or consent, Wells Fargo used the unauthorized Patterson account to move $4,992.00 on March 23, 2022, via ACH from the unauthorized Patterson account to a bank account associated with Peoples' United Bank.

76.   Patterson does not have any account with Peoples' United Bank and did not authorize any transfer of funds from any account in his name to any account with Peoples' United Bank.

77.   Patterson's August 2, 2022, Early Warning credit report revealed to Patterson for the first time that Wells Fargo processed or attempted to process three more ACH transactions between April and May of 2022 using the unauthorized Patterson account. Each attempted ACH transaction

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

was in the amount of $5,000.00, and all were "returned" due to "insufficient funds." Mr. Patterson did not know about or authorize any of these returned transactions that Wells Fargo reported on its trade line for the unauthorized Patterson account, which are considered derogatory statements that hurt Patterson's credit rating.

78. Having a transaction reported as returned due to insufficient funds is considered a derogatory mark on the consumer's credit history and can negatively affect the consumer's ability to open accounts and/or obtain credit.

79. Although Wells Fargo had acknowledged its June 24, 2022, letter to Patterson, that the Patterson account was not his responsibility, the Wells Fargo trade line for the Patterson account on the August 2, 2022, Patterson Early Warning credit report also does not say that Wells Fargo's unauthorized Patterson account was opened fraudulently or that Patterson was potentially the victim of identity theft.

80. By the time Patterson first obtained his Early Warning credit report on August 2, 2022, Wells Fargo had already determined that his account was opened fraudulently, yet Wells Fargo failed to update the trade line for Wells Fargo's unauthorized Patterson account with Early Warning to include any reference to or mention of fraud or identity theft.

81. Yet after June 17, 2022, Wells Fargo did make adjustments to the trade line for the unauthorized Patterson account, including noting that the account was closed as of July 6, 2022.

82. Other than by calling Wells Fargo on June 17, 2022, Patterson did not have any direct role in closing this account.

83. Wells Fargo's trade line on Patterson's August 2, 2022, Early Warning report does not explain why the account remained open for 12 days after Wells Fargo sent Patterson correspondence on June 24, 2022, confirming that Wells Fargo knew that Patterson did not open or know of the account.

84. Despite having acknowledged to Patterson that the account was opened without his knowledge, Wells Fargo continued to report the existence of the four unauthorized and fraudulent ACH transactions that Wells Fargo processed using the unauthorized Patterson account, three of

which were ACH transactions Wells Fargo continued to falsely report as returned due to insufficient funds.

85. Patterson's August 2, 2022, Early Warning report indicated that just two entities inquired with Early Warning after Wells Fargo opened the unauthorized Patterson account. Among the listed inquiries was an inquiry by Wells Fargo, which occurred the day after it opened the unauthorized Patterson account. The other inquiry disclosed on the August 2, 2022, Early Warning report was made by GIAct Services, which is a company that provides services related to payment and identity fraud prevention. On information and belief, neither Wells Fargo nor Early Warning has informed GIAct Services that all of the information in the Wells Fargo account trade line on Patterson's Early Warning report was false and/or that the Wells Fargo account had been opened without Patterson's knowledge.

86. Patterson promptly disputed the Wells Fargo trade line on the Early Warning report in a written dispute he sent to Early Warning on or about August 3, 2022.

87. On information and belief, Early Warning communicated Patterson's dispute to Wells Fargo, which, in response to Early Warning's communication of Patterson's dispute, verified that the account was fraudulent.

88. In response to Patterson's dispute, Early Warning deleted the Wells Fargo trade line and deleted the reference to Wells Fargo's March 11, 2022, inquiry (a/k/a "credit pull") on a "corrected" Early Warning report for Patterson, which was dated September 1, 2022.

89. Although Early Warning's deletion of the trade line for the unauthorized Wells Fargo account on Patterson's September 1, 2022 "connected" Early Warning report was proper, Early Warning's deletion of the fact that Wells Fargo obtained Plaintiff's Early Warning credit report on March 11, 2022, was not, as it had the effect of concealing the fact that Wells Fargo had impermissibly obtained access to Patterson's Early Warning credit report and the detailed, sensitive PII and PFI it contains.

90. Early Warning's September 1, 2022 "corrected" report following Patterson's dispute did not merely delete the Wells Fargo trade line and Wells Fargo's prior inquiry: it also revealed that

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Early Warning received 13 additional but previously undisclosed formal inquiries from third parties that were not listed on Patterson's August 2022 Early Warning credit report.

91. Based on the publication dates for the inquiries on the September 1, 2022 "corrected" Early Warning report responding to the Patterson dispute, Wells Fargo and Early Warning falsely reported that Patterson had at least one and up to three recent scheduled ACH transactions returned for insufficient funds no fewer than 14 times to no fewer than 5 different third parties.

### Plaintiff Joshua P. Adams's Experience

92. On or about July 18, 2023, Adams received a "Wells Fargo Everyday Checking" statement for a checking account ending in 3933.

93. The bank statement Adams received indicated that the beginning balance for the checking account was $195.40 on June 16, 2023, and that the ending balance, after the deduction of a $10.00 Monthly Service Fee, was $185.40 on July 18, 2023.

94. Adams never applied for, opened, and/or held an account with Wells Fargo prior to or while he received the July 18, 2023, checking account statement.

95. Indeed, on information and belief, there is a lack of brick-and-mortar branches owned and/or operated by Wells Fargo where Adams resides, so banking with Wells Fargo would be unreasonably inconvenient for Adams.

96. Concerned by his receipt of the checking account statement, Adams called Wells Fargo's customer service number at (800)869-3557 about one-to-two weeks after receiving the July 18, 2023, checking account statement.

97. During that call, Adams complained to a Wells Fargo representative about the unauthorized checking account and requested all the account statements associated with it.

98. Though Adams was denied his request over the phone, he later received a letter from Wells Fargo, dated August 10, 2023, which included alleged statements for the unauthorized Wells Fargo checking account from October 18, 2021, through July 18, 2023.

99. After reviewing each of the checking account statements, Adams noticed that the first transaction to appear on the account was dated October 20, 2021, with the description "IRS

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Treas 310 Taxeip3102021xxxxxxxxxx00928 Williams, Latasha" for a total of $1,400.00. Adams does not know a Latasha Williams, nor did Adams authorize the October 20, 2021, transaction.

100. Adams also noticed several transactions using Zelle in 2022, which he never authorized. For instance, on January 5, 2022, $996.61 was withdrawn through Zelle from Adams's unauthorized checking account from a "Liao Bin," and on January 6, 2022, $377.41 was withdrawn through Zelle from Adams's unauthorized checking account from a "Mullet Sarah." Similarly, on March 29, 2023, $162.33 was withdrawn through Zelle from Adams's checking account from a "Mountain Zol" after two mobile deposits were made to the account on March 28, 2022, and March 29, 2022, respectively.

101. Concerned that his identity may have been stolen, Adams decided to check his credit reports with Early Warning, which he received on August 10, 2023, and August 18, 2023, respectively.

102. The unauthorized Wells Fargo checking account (ending in 3933) appeared on both Early Warning reports and was reported as having been opened on September 21, 2021.

103. The same account was also reported by Early Warning with a mix of both accurate and inaccurate PII for Adams. For instance, Early Warning reported information such as Adams's telephone number, email address, driver's license state, number, and expiration date incorrectly. However, information such as Adams's residential address and social security number was reported correctly.

104. Furthermore, Adams's August 18, 2023, Early Warning credit report shows "WELLS FARGO" and "WELLS FARGO BANK" as having inquired into Adams's credit on September 21, 2021, and September 22, 2021, respectively.

105. Adams never provided Wells Fargo with his PII, nor has Adams authorized Wells Fargo to inquire about his credit or Early Warning to report an unauthorized account on his credit report.

**Plaintiff Linda G. Jordan's Experience**

106. On or about November 5, 2021, Jordan received a "Wells Fargo Everyday Checking" statement for an account ending in 1973 that showed a $0.00 balance.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

107. Jordan never applied for, opened, and/or held an account with Wells Fargo prior to or while she received the November 5, 2021, bank statement.

108. Immediately after receiving the November 2021 bank statement, Jordan called Wells Fargo to report and close the unauthorized checking account.

109. On the call, one of Wells Fargo's representatives informed Jordan that someone may have accessed her personal information, such as social security number, drivers' license number, and telephone numbers. The Wells Fargo representative also indicated that Wells Fargo would close the unauthorized checking account.

110. On or about November 12, 2021, Jordan received a letter following up on her call to Wells Fargo. It did not state that the account was closed. In that letter, Wells Fargo indicated that it would restrict the ability to withdraw funds from the account, block deposits and credits to the account, and block automatic or recurring deposits to or payments from the account. The letter also stated that the account was referred for additional investigation.

111. After receiving the November 12, 2021, letter from Wells Fargo, Jordan took immediate steps to protect her credit. Namely, Jordan purchased Equifax's credit monitoring service for $16.95 per month and requested that Equifax, Experian, and Transunion place a security alert on her credit file.

112. Jordan also submitted an identity theft affidavit with the Federal Trade Commission on November 13, 2021; a "FRAUD REVIEW OF DRIVER LICENSE/IDENTIFICATION RECORD" form with the California Department of Motor Vehicles on or about November 15, 2021; a request to the Social Security Administration on November 15, 2021, for additional security on her Social Security account; and a police report with the Pleasanton Police Department on November 17, 2021, describing the problems she had experienced with the Wells Fargo checking account which was opened in her name, using her PII, without her authorization.

113. Jordan received another letter from Wells Fargo, dated November 24, 2021, indicating that Wells Fargo completed its investigation and determined that Jordan "did not open or have any

knowledge of the account(s) with Wells Fargo" and that Wells Fargo "removed any information relating to the account(s) that [it] may have reported."

114. After receiving the November 24, 2021, letter, Jordan called Wells Fargo again on December 1, 2021, to ask why the unauthorized account was not closed yet. In response, a Wells Fargo representative told Jordan that closure occurs in 30 days, at which point she would receive another letter confirming as such. On the same call, Jordan requested information about the investigation that was conducted per the November 24, 2021, letter, but the Wells Fargo representative refused to provide Jordan with the requested information.

115. On or about December 7, 2021, Jordan received another account statement from Wells Fargo for the same checking account ending in 1973. The statement had the same $0.00 as the November 2021 statement Jordan received.

116. Jordan then received a letter dated December 30, 2021, indicating that Wells Fargo would close the checking account ending in 1973 by January 13, 2022.

117. On or about January 7, 2022, Jordan received an additional account statement for the checking account showing the same information as the November and December 2021 statements she had previously received.

118. Having received various statement from Wells Fargo for an account opened in her name without her permission, Jordan submitted credit freeze requests with Equifax, Experian, and Transunion on or about January 28, 2022.

119. On August 4, 2023, after having been made aware of Patterson's case against Wells Fargo and Early Warning, Jordan submitted a request to Early Warning for her credit report.

120. Early Warning sent Jordan a copy of her credit report on August 10, 2023. While the report did not list details about the unauthorized Wells Fargo checking account, it did list two inquiries from "WELLS FARGO" and "WELLS FARGO BANK" on October 16, 2021, and October 19, 2021, respectively, even though Wells Fargo said it "removed any information relating to the account(s) that [it] may have reported" as far back as November 24, 2021.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

121.   The same Early Warning Credit Report listed other inquiries postdating those made by Wells Fargo, including an inquiry by Capital One on April 6, 2023, and an inquiry by GEICO on August 7, 2023.

## Plaintiffs' and the Class's Collective Experience

122.   Plaintiffs have been injured by Wells Fargo's unauthorized electronic funds transfers via Wells Fargo's unauthorized accounts.

123.   Plaintiffs have been injured by Defendants' false credit reporting.

124.   Plaintiffs have been injured by Defendants' theft of their PII and PFI.

125.   On information and belief, Wells Fargo furnished, and Early Warning published in response to third party inquiries, false trade line information regarding one or more unauthorized accounts Wells Fargo opened in Plaintiffs' and the putative class members' names.

126.   Now Plaintiffs and class members must incur the cost of protecting themselves against identity fraud. Defendants should bear that cost.

127.   Plaintiffs experienced great stress, personal inconvenience, and expenses as a consequence of Defendants' actions as described herein.

128.   Wells Fargo's actions placed Plaintiffs at risk of prosecution and exposure to criminal liability for money laundering, as Wells Fargo transferred money in Plaintiffs' names to third parties without Plaintiffs' knowledge or consent.

129.   Defendants' actions also placed Plaintiffs at great risk of false and/or incorrect credit reporting, which affected their credit and financial well-being.  Plaintiffs are also at great risk of identity theft and/or unauthorized publication and dissemination of their PII.

## CFPB Complaints Reveal Many Other Victims

130.   Defendants did not just do this to Plaintiffs. The complaint database the Consumer Financial Protection Bureau or "CFPB" maintains for consumer complaints reveals more than fifty other consumers with complaints about unauthorized accounts Wells Fargo opened in consumers' names through identity fraud - in just March through June of 2022.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

131. Wells Fargo responded to each of the consumer complaints through the CFPB, but Wells Fargo did not comment publicly as to any allegation that it opened any unauthorized account in the name of any of the CFPB complainants. **See Appendix A, list of CFPB complaints about Wells Fargo opening unauthorized consumer banking accounts.**

132. Searching for similar complaints filed by consumers with the CFPB alleging similar misconduct by other financial institutions reveals that Wells Fargo has received substantially more complaints on this issue during the same time period than any other major U.S. bank.

### Wells Fargo's History of Abusing Consumers

133. Wells Fargo has a long history of engaging in practices that are harmful to consumers. Specifically, Wells Fargo has entered into a number of consent orders and settlements with the Consumer Financial Protection Bureau ("CFPB"), the Federal Trade Commission ("FTC"), Office of the Comptroller of the Currency ("OCC"), and other regulatory agencies.

134. In 2015, the OCC found deficiencies in Wells Fargo's internal controls related to the Bank Secrecy Act and Anti-Money Laundering rules in the Wholesale Banking Group. The consent order noted that Wells Fargo had not made acceptable progress toward correcting previously identified problems in this area. In the Matter of Wells Fargo Bank, N.A., OCC AA-EC-2015-79 (Nov. 19, 2015).

135. In 2016, Wells Fargo also entered into settlements with the CFPB, OCC, and the City of Los Angeles in the combined amount of $185 million for Wells Fargo's practice of opening unauthorized deposit and credit accounts without the customer's knowledge. Wells Fargo also entered into a $142 million settlement with account holders regarding this practice. *See Jabbari v. Farmer*, No. 18-16213, No. 18-16236, No. 18-12684, No. 18-12685, No. 18-16315, No. 18-16317, 2020 WL 4048683 (9th Cir. July 20, 2020) (overruling objections to approval of class action settlement).

136. In April 2018, Wells Fargo entered into agreements with the OCC and the CFPB totaling $1 billion for Wells Fargo's practices relating to forcing customers to pay for interest rate lock extensions when the bank caused the delays and forcing customers to purchase unnecessary

insurance policies when purchasing vehicles with loans from Wells Fargo.  That same year, Wells Fargo refunded millions of dollars in fees for add-on products such as pet insurance and legal services that were placed on customers' accounts without their full understanding. In the Matter of Wells Fargo Bank, N.A., CFPB 2018-BCFP-0001 (April 20, 2018); OCC AA-EC-2018-16 (April 20, 2018).

137.   In December 2018, Wells Fargo agreed to pay $575 million to resolve claims with the 50 states and the District of Columbia relating to Wells Fargo's practice of opening accounts without consumer consent, force-placed collision insurance on auto loans, and excessive fees charged to mortgage borrowers for extending a rate lock.[9]

138.   In February 2020, Wells Fargo agreed to pay $3 billion to resolve its potential civil and criminal liability stemming from Department of Justice allegations that it engaged in a years-long process of pressuring employees to meet unrealistic sales goals that led to the creation of thousands of fake accounts.  In connection with the settlement, Wells Fargo admitted that it collected millions of dollars in fees and interest to which it was not entitled, harmed certain customers' credit, and unlawfully misused customers' personal information.[10]

### Defendants' Awareness of the Harmfulness and Prevalence of Synthetic Identity Fraud

139.   Federal banking laws require financial institutions to maintain and follow robust procedures for identifying the identity of prospective bank customers, which are known as "KYC" (know your customer) and "AML" (anti-money laundering) requirements. These requirements are embodied in statutes and other federal rules and regulations.

---

[9] NAT'L ASS'N OF ATTORNEYS GENERAL, Wells Fargo Multistate Settlement Agreement (Dec. 28, 2018), https://www.naag.org/wp-content/uploads/2021/10/654-2018.12.28-Multistate-Wells-Fargo-Settlement-Agreement.pdf.

[10] DEP'T OF JUSTICE, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization* (Feb. 21, 2020), https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

140.    Banks' and credit reporting agencies' identity verification processes and procedures represent a critical first line of defense against a particularly pervasive form of identity fraud known in the financial services community as "synthetic identity fraud."

141.    Synthetic identity fraud, generally, is the fraudulent use of some of a consumer's true personal identification information in combination with some false personal identification information in order to open financial accounts in the consumer's name without the consumer's knowledge or consent. Typically, synthetic identity fraudsters use these unauthorized accounts for various criminal purposes, including (among other things) money laundering, theft from the victim's legitimate financial accounts, and to open credit accounts in the victim's name, which can be used to make fraudulent purchases without the victim's knowledge or consent.

142.    Early Warning has long been aware of the dangers posed by synthetic identity fraud, and Early Warning's website contains multiple articles about the threat posed by synthetic identity fraud to financial institutions and consumers alike, which Early Warning uses to market its information security and fraud prevention business to financial institutions and other businesses that regularly manage sensitive consumer PII and PFI.[11]

143.    Similarly, LNRS has published multiple articles regarding synthetic identity fraud and the risk it poses in financial identity verification, KYC, and AML procedures.[12]

---

[11] *A Perfect Storm of Identity Fraud is On the Horizon*, EARLY WARNING (May 23, 2016), https://www.earlywarning.com/blog/perfect-storm-identity-fraud-horizon; *Application Fraud: Understanding and Addressing the Challenge*, EARLY WARNING (Feb. 14, 2019), https://www.earlywarning.com/blog/application-fraud-understanding-and-addressing-challenge; *Winning the Fight Against Application Fraud: How to Mitigate Risk and Onboard More Costumers*, EARLY WARNING (May 11, 2021), https://www.earlywarning.com/blog/winning-fight-against-application-fraud-how-mitigate-risk-and-onboard-more-customers; *Are Some of Your Customers Fake? Grappling with Synthetic Identity Fraud*, EARLY WARNING (Jan. 5, 2022), https://www.earlywarning.com/blog/are-some-your-customers-fake-grappling-synthetic-identity-fraud; Robin Love, *The Best Way to Prevent Synthetic Identity Fraud? Focus on Application Fraud*, EARLY WARNING, https://www.earlywarning.com/blog/best-way-prevent-synthetic-identity-fraud-focus-application-fraud (last visited Nov. 6, 2023).

[12] Chris Schnieper, *Prepare for the Future of Fraud*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/insights-resources/article/prepare-for-the-future-of-fraud (last visited Nov. 6, 2023); *Uncovering Synthetic Identity Fraud*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/insights-resources/article/synthetic-identity-fraud (last visited Nov. 6, 2023); Kim White, *Are Fraud Rings Lurking in Your Portfolio?*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/insights-resources/article/are-fraud-rings-lurking-in-your-portfolio (last visited Nov. 6, 2023); *Detect and Disarm Identity Fraud Rings*, LEXISNEXIS RISK SOLUTIONS, https://risk.lexisnexis.com/insights-resources/article/identity-fraud-rings (last visited Nov. 6, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

144. Because they have such detailed personal identification information for practically every American consumer's personal and business banking accounts, Early Warning should easily be able to recognize inconsistencies in PII for consumers submitted by financial institutions seeking information about such consumers.

145. Given the false PII Wells Fargo associated with Plaintiffs' and the other putative class members' unauthorized accounts, it was unreasonable per se for Early Warning and/or LNRS to "verify" the identities of these victims in response to Wells Fargo's inquiries in connection with the opening of the unauthorized accounts.

146. Wells Fargo uses Early Warning and/or LNRS as "third party" identity verification services to create the appearance that it is complying with these KYC and AML requirements. At least with respect to the putative members of this class, neither Wells Fargo nor EWS and/or LNRS make a meaningful effort to verify consumers' identities before Wells Fargo opens consumer banking accounts in their name.

**How Defendants' Unauthorized Account / Synthetic Identity Fraud Identity Theft Scheme Works (account opening and credit reporting procedures)**

147. As relevant here, Early Warning and/or LNRS falsely verified Plaintiffs' identities to Wells Fargo in connection with Wells Fargo's opening of unauthorized accounts and improperly granted Wells Fargo access to Plaintiffs' confidential Early Warning and/or LNRS credit files containing their detailed (true) PII and PFI.

148. Early Warning also reported false transaction and PII regarding Patterson in connection with the trade lines Wells Fargo furnished to Early Warning for the unauthorized Patterson account, which Early Warning published several times to various third parties.

149. Similarly, Early Warning provided Wells Fargo with access to Jordan's credit file (and the PII and PFI therein) without Jordan's knowledge or prior authorization. Early Warning then published the fact that Wells Fargo inquired into Jordan's credit file, despite Wells Fargo not

having a permissible purpose in doing so, to third parties who later inquired into Jordan's credit file, i.e., Capital One and GEICO.

150. On information and belief, Wells Fargo and Early Warning and/or LNRS failed to follow industry standards for identity verification when Wells Fargo opened the Plaintiffs' accounts, including: (1) failing to use appropriate identity proofing methods, such as behavioral scores and capturing information about the device used during the online or mobile application process that resulted in Wells Fargo's opening of the unauthorized accounts; (2) failing to verify the opening deposit; and (3) requiring less information to verify Plaintiffs' identities than they require consumers to provide in order to obtain their own consumer file directly from Early Warning and/or LNRS.

151. Defendants have been working together to falsely verify consumers' identities, opening unauthorized bank accounts in consumers' names using a combination of true and false PII for the consumers, processing financial transactions through these unauthorized accounts, and then furnishing false trade line information about these unauthorized accounts and unauthorized transactions to Early Warning, which information Early Warning then publishes to users of Early Warning's specialty credit reporting service.

152. Because Wells Fargo was permitted to impermissibly obtain Plaintiffs' and the putative class members' Early Warning reports, a notation on those reports reflecting that Wells Fargo made inquiries of Early Warning with respect to the Plaintiffs' and putative class members' files lent further undue credibility to the veracity of the unauthorized Wells Fargo accounts and the associated false PII and fraudulent banking information Wells Fargo furnished to Early Warning with respect to the unauthorized accounts.

153. Early Warning and/or LNRS provide fraudulent identity "verification" services for Wells Fargo when Wells Fargo creates consumer banking accounts. This "verification" lends fraudulently opened accounts a false veneer of legitimacy.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

154.    Then, once an unauthorized account has been opened in the consumer victim's name, Early Warning allows Wells Fargo to request and obtain the consumer's detailed confidential personal Early Warning banking credit report.

155.    Consumers' confidential PII and PFI is inherently valuable.[13] This is one reason data breaches have proliferated – the data stolen in these breaches is often available for purchase on the "dark web" and other sources.

156.    By obtaining this confidential personal identification and banking information without the consumers' permission or even their knowledge, Wells Fargo is injuring the unwitting consumers and unjustly enriching itself.

**Class Allegations**
**With the assistance of EWS and LNRS, WFB and WFC have opened unauthorized bank accounts for Plaintiffs and the putative class members.**

157.    WFB has processed unauthorized electronic financial transactions, including funds transfers, using those unauthorized accounts for Patterson and Adams.

158.    Defendants WFB, WFC, and EWS have also knowingly and willfully furnished and published to third parties false and defamatory trade line credit reporting information regarding Plaintiffs and the other putative class members, have inquired into Plaintiffs' and putative class members' credit files without a permissible purpose, and/or have authorized impermissible inquiries into Plaintiffs' and putative class members' credit files. As a result of Defendants' misconduct, Plaintiffs and the putative class members have suffered reputation injuries and other actual harms and losses.

159.    Plaintiffs are members of and seek to represent the following Class:

> All persons within the United States who have or had an unauthorized bank account that was opened by Wells Fargo in connection with Defendants' verification of the person's identity based on an "application"

---

[13] While difficult to quantify, it is estimated that data collected from consumers each year is worth over $185 billion. José Bayoán Santiago Calderón & Dylan G. Rassier, *Valuing the U.S. Data Economy Using Machine Learning and Online Job Postings*, U.S. Bureau Econ. Analysis, Working Paper No. 2022-13, 2022), https://www.bea.gov/system/files/papers/BEA-WP2022-13.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

that included a combination of some of the person's true and false PII, within the four years prior to the filing of the complaint in this action.

160. Plaintiffs Adams and Patterson are members of and seek to represent the following EFTA Subclass:

> All persons within the United States who have or had a bank account opened by Wells Fargo that was used by Wells Fargo to process one or more unauthorized electronic funds transfer transactions.

161. Plaintiffs are members of and seek to represent the following FCRA Subclass:

> All persons within the United States whose credit report and/or consumer disclosure from Early Warning and/or LNRS was obtained by Wells Fargo without authorization.

162. Plaintiff Jordan is a member of and seeks to represent the following CCRAA Subclass:

> All persons within California whose credit report and/or consumer disclosure from Early Warning and/or LNRS was obtained by Wells Fargo without authorization as a result of Wells Fargo opening an unauthorized account in their name using a mix of true and false PII.

163. Together, the Class, EFTA Subclass, FCRA Subclass and CCRAA Subclass are collectively referred to as the "Classes," and the EFTA Subclass, FCRA Subclass, and CCRAA Subclass, together, are referred to as the "Subclasses."

164. Excluded from the Class and Subclasses are: (1) defendant, any entity or division in which defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injury as a result of the facts alleged herein.

165. Plaintiffs bring this lawsuit as a class action on behalf of themselves and class members of the proposed Classes. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

166. <u>Numerosity</u>: the members of the Class and Subclasses are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Classes is currently

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

unknown to Plaintiffs at this time; however, given that, on information and belief, Defendants' conduct resulted in thousands of unauthorized bank accounts being opened and thousands of impermissible credit inquiries with respect to each class member across the country during the class period, it is reasonable to presume that the members of the class are so numerous that joinder of all class members is impracticable.

167.    For example, during just the four-month period of March through June of 2022, Wells Fargo was the subject of more than 40 unique consumer complaints filed with the CFPB alleging that Wells Fargo opened an unauthorized bank account in the name of the complaining consumer when the consumer had no pre-existing banking relationship with Wells Fargo at the time the account was opened. The number of CFPB complaints Wells Fargo received with respect to this specific fact pattern far outnumbered the number of similar complaints filed with the CFPB that were lodged against any other financial institution during the same period.

168.    <u>Commonality</u>: there are common questions of law and fact as to class members that predominate over questions affecting only individual members, including, but not limited to:

•    Whether Wells Fargo obtained class members' authorization to use or obtain class members' credit reports from Early Warning;

•    Whether Early Warning had reason to believe that Wells Fargo lacked a legitimate business purpose for obtaining the class members' credit reports at the time Early Warning provided those reports to Wells Fargo;

•    Whether Wells Fargo obtains class members' credit files in connection with any transaction involving the extension of credit to class members;

•    Whether within the statutory period, Wells Fargo obtained or used class members' credit reports for a purpose not enumerated by the FCRA 15 U.S.C. § 1681f(b);

•    Whether within the statutory period, Early Warning and/or LNRS provided class members' credit reports to Wells Fargo for a purpose not enumerated by the FCRA 15 U.S.C. § 1681f(b);

•    Whether within the statutory period, Early Warning provided class members' credit reports to Wells Fargo in spite of the fact that the identity verification information associated with the consumers' unauthorized Wells Fargo accounts was materially inconsistent with the

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

identity verification information Early Warning associated with such consumers' legitimate accounts that were included in Early Warning's files for such consumers;

•      Whether Early Warning and/or LNRS verified the identity of consumers in response to identity verification information submitted by Wells Fargo in connection with an unauthorized online consumer banking account application even though such information was materially inconsistent with the identity verification information associated with such consumers;

•      Whether Wells Fargo retained the confidential personal financial information contained in the credit reports it obtained from Early Warning and/or LNRS regarding the class members despite having no legitimate business relationship with the class members;

•      Whether Plaintiffs and class members were damaged thereby, and the extent of damages for such violations; and

•      Whether an injunction should issue with respect to Defendants:

      o      Requiring Defendants to:

            ▪      delete all unlawfully obtained consumer credit information that each Defendant obtained as a consequence of Wells Fargo's opening of unauthorized consumer bank accounts for Plaintiffs and the class members;

            ▪      jointly and severally ensure that the Plaintiffs and class members' credit reports do not contain any information pertaining to any unauthorized account(s) Wells Fargo opened in Plaintiffs' or any class member's name;

            ▪      each separately communicate to Plaintiffs and each of the class members the name and contact information belonging to every person or entity to whom the Defendants provided information regarding or related to the unauthorized account Wells Fargo opened in the Plaintiffs' or class members' names, as well as the date(s) on which each Defendant provided the relevant information, and the information Defendants provided to such person or entity;

            ▪      each separately inform every person or entity to whom the Defendants provided information regarding or related to each unauthorized account Wells Fargo opened in Plaintiffs' or any other class member's name that (a) each account (which shall be identified specifically) was not authorized or opened by said Plaintiffs or class member in whose name it was opened; (b) the opening of each account was the result of a fraud that Defendants failed to detect and prevent (identifying the specific fraudulent information that Defendants received regarding each Plaintiff or class member in connection with the unauthorized account application), and confirming that, as far as Defendants are aware, each

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

> Plaintiff or class members had no knowledge of and took no part in the fraudulent opening of the account, and
>
> o   Prohibiting Defendants from:
>
>   ▪   opening any new consumer checking account for any individual who is not a pre-existing banking customer of the Defendant until this Court certifies that Defendants have developed and implemented identity verification processes and procedures that would have prevented the unauthorized opening of Plaintiffs' and the class members' accounts based on the information Defendants collected regarding Plaintiffs and the class members prior to opening the Plaintiffs' and class members' unauthorized accounts.

172.   <u>Typicality</u>: Plaintiffs, who are natural persons, are asserting claims that are typical of the Class and Subclasses, as Plaintiffs (i) had a bank account opened by Wells Fargo without authorization in connection with Defendants' purported verification of Plaintiffs' identity involving some of the Plaintiffs' true and false PII, (ii) the bank accounts of Adams and Patterson were used to make several unauthorized electronic funds transfers by Wells Fargo, and (iii) Plaintiffs' PII and PFI was obtained by Wells Fargo without Plaintiffs' authorization.

173.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses in that Plaintiffs have no interests antagonistic to any member of the Class and Subclasses. Plaintiffs have retained counsel experienced in handling individual and class action claims involving consumer rights similar to those implicated here.

174.   Valuing Plaintiffs' / the class members' claims mechanically is feasible by reference to applicable credit market opportunity, available equity (unencumbered property value minus loan balance), cost of credit protection measures (in time and expense), correction of prior false reporting to third parties, and 'market' value of the PII and PFI personal identification information that Wells Fargo unlawfully obtained through this scheme.

175.   A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with state and federal law. The interest of class members in individually controlling the prosecution of separate claims

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

1    against the Defendants is small because the maximum statutory damages in an individual action

2    are minimal.

3    176.    Defendants have acted and continue to act on grounds generally applicable to the Class and

4       Subclasses, thereby making appropriate, final injunctive relief and corresponding declaratory

5       relief, with respect to the Class and Subclasses as a whole.

6    177.    Plaintiffs reserve the right to redefine the Class and Subclasses as well as assert additional sub-

7       classes as appropriate based on discovery and specific theories of liability.

**VI.  CAUSES OF ACTION**
**COUNT I**
**VIOLATIONS OF THE RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

178.    Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

179.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity . . .."

180.    At all relevant times, Defendants are and have been "person[s]" within the meaning of 18 U.S.C.

§1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in

property."

181.    As set forth in the allegations of this complaint, Defendants conducted the affairs of the

enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

182.    Plaintiffs are "person[s]" for purposes of 18 U.S.C. §1961(3) and have standing to sue under 18

U.S.C. § 1964(c), as Plaintiffs were and are injured in their business and/or property by reason

of Defendants' RICO Act violations.

**A.    The Enterprise**

183.    § 1961(4) of the RICO Act defines an enterprise as "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity." 18 U.S.C. § 1961(4).

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

184. Based on the Plaintiffs' current knowledge, information, and belief, the enterprise in this case constitutes an association in fact enterprise, referred to herein as the "Synthetic Identity Fraud Enterprise," consisting of:

- WFC;

- WFB;

- Early Warning;

- Early Warning's other non-defendant owner banks;

- Early Warning's 2,500+ member financial institutions that furnish information to and obtain consumer reports from Early Warning;

- LNRS; and

- Other vendors and third parties that created, maintained, used, and implemented the systems and processes used by members of the enterprise, including Defendants, to establish unauthorized consumer bank accounts, unlawfully disclose, publish, and/or obtain consumers' confidential personal identification information and consumers' detailed personal and business banking information, and/or to facilitate, transfer, receive, or benefit from unauthorized electronic funds transfers using Plaintiffs' and the putative class members' unauthorized bank accounts.

185. The Synthetic Identity Fraud Enterprise is an ongoing organization that engages in and whose activities affect interstate commerce.

186. The members of the Synthetic Identity Fraud Enterprise function as a continuing unit and share the common purpose of maximizing their profits by establishing and processing payments using unauthorized consumer bank accounts, using the unauthorized consumer bank accounts as a proxy to gain access to the consumer's true and correct personal identification information and detailed personal and business banking history information, and to disseminate false, deceptive, and defamatory information about consumers through the furnishing and publication of false information regarding unauthorized consumer bank accounts opened by Wells Fargo in

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

consumers' names, including false identification information and false information about account transactions on the unauthorized consumer accounts.

187. The Synthetic Identify Fraud Enterprise is linked systematically through contractual relationships, ownership, financial ties, parent/subsidiary relationships, and ongoing commercial relationships.

188. On information and belief, Wells Fargo has contracted with LNRS to provide it with fraudulent and or/ recklessly unreliable identity verification services, which Wells Fargo uses when opening unauthorized consumer bank accounts based on synthetic identity fraud.

189. WFB is a partial owner of and, on information and belief, has contracted with Early Warning to provide it with fraudulent and/or recklessly unreliable credit reporting, background check, and/or identity verification services, which Wells Fargo uses when opening unauthorized consumer bank account based on synthetic identity fraud.

190. WFB, as a member of Early Warning's network of 2,500+ financial institutions across the United States, has contracted with Early Warning to furnish and obtain consumer file information regarding consumers' personal and/or business bank accounts, including unauthorized consumer banking accounts Wells Fargo opened in Plaintiffs' and the other class members' names.

191. While all Enterprise members participate in and are part of the Synthetic Identity Fraud Enterprise, they each exist as a separate and distinct entity apart from the Enterprise.

192. WFC is a diversified financial services company organized under the laws of Delaware and registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended.

193. WFC provides banking, investment, and mortgage products and services, as well as consumer and commercial finance through banking locations, ATMs, the internet, and mobile banking.

194. WFC conducts substantially all its operations through its subsidiaries, including but not limited to WFB, although WFC is a separate and distinct legal entity from its subsidiaries, including WFB.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

195. A significant source of the funds WFC reports as revenue and uses to pay dividends on its common and preferred stock and debt service on its debt is dividends from WFC's subsidiaries, including dividends from WFB generated by the Synthetic Identity Fraud Enterprise.

196. WFC uses funds it obtains from WFB, including funds generated in connection with the Synthetic Identity Fraud Enterprise, to satisfy WFC's financial obligations, including payments of principal and interest on WFC's debt.

197. Together Defendants control, operate, and direct the affairs of the Synthetic Identity Fraud Enterprise by, among other things, working together to falsely "verify" false consumer identity information in connection with opening unauthorized consumer banking accounts, and then they work together to exchange, furnish, and publish false consumer banking account and history information via Early Warning's consumer reporting service in order to obtain the consumer's valuable true and correct personal identification and banking history information, as well as to legitimize the false information Wells Fargo reports regarding the consumer's identity and banking history for the unauthorized account Wells Fargo established in the injured consumer's name.

198. The Synthetic Identity Fraud Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity.

**B.  Defendants committed numerous predicate acts constituting racketeering activity for purposes of RICO liability**

199. § 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged and continue to engage in conduct violating each of these laws in order to effectuate their fraudulent scheme.

200. For purpose of executing and or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including

34

but not limited to serving through the mail correspondence with victims of Defendants' Synthetic Identity Fraud Enterprise with unauthorized Wells Fargo accounts, including statements and other written and mailed correspondence to Plaintiffs and the putative class members regarding these unauthorized accounts.

201. The matter and things Defendants sent via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: false trade line information furnished by Wells Fargo to Early Warning regarding the unauthorized consumer bank accounts, which Early Warning then published in response to ordinary course inquiries by third party financial services entities regarding Plaintiffs' credit file pertaining to their personal and/or business banking history, as well as false, deceptive, and misleading communications regarding the source of the unauthorized accounts Wells Fargo established in Plaintiffs' and the class members' names, and false information regarding the identity of parties to whom Early Warning provided false information regarding Wells Fargo's unauthorized bank account in Plaintiffs' and the putative class members' names, and false and misleading information regarding the identity of parties who made inquiries regarding Plaintiffs to Early Warning and the frequency with which Early Warning received and responded to such inquiries.

202. Other matter and things Defendants sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media include information or communications in furtherance of or necessary to effectuate the scheme, including (without limitation) Wells Fargo's furnishing and Early Warning's publication of false credit reporting trade line information to third parties in response to inquiries with respect to Patterson's credit file, misrepresenting the origin, status, reasons for making changes to, and validity of the unauthorized accounts in communications with Plaintiffs and the putative class members and others.

203. Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and were made for purposes of deceiving Plaintiffs and the putative class members, other users of Early Warning's consumer banking credit reporting and identity verification

service and/or the recipients or intended recipients of unauthorized financial transactions processed by Wells Fargo using Plaintiffs' and/or the class members' unauthorized accounts.

204. For example, Wells Fargo failed to promptly send a monthly checking account statement to Patterson and Adams until several months after opening the unauthorized accounts in their respective names, and Wells Fargo failed to include various transactions that Wells Fargo processed using the unauthorized accounts of Adams and Patterson during the first several weeks that the accounts were open on the account statements Wells Fargo sent to them, thereby leaving Adams and Patterson unaware that there had been any fraudulent transactions on their respective accounts, which Wells Fargo and Early Warning falsely reported to third parties.

205. Additionally, Defendants' communications with Plaintiffs intimated that they were a victim of some other party's identity fraud and directed them to take action to mitigate the harm caused by this identity fraud, when in fact Defendants were participating in the fraud, hiding unauthorized transactions on the accounts, and failing and/or refusing to take action to correct their own misconduct in falsely verifying Plaintiffs' identities, opening the unauthorized accounts, without a permissible purpose providing and obtaining Plaintiffs' confidential Early Warning banking consumer credit file information containing their correct detailed personal identification, and their personal and/or business banking information going back for years, and actively furnishing and publishing false personal identity and banking/transaction information about Plaintiffs in connection with the trade lines Wells Fargo furnished for the unauthorized accounts.

206. Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use of the U.S. Mail and interstate wire services, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

207. Defendants either knew or recklessly disregarded the fact that their misrepresentations and omissions regarding Patterson's, Adams's, and the putative class members' unauthorized bank

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

accounts were material and that the users of Early Warning's credit reporting service and others would rely and in fact did rely on their false belief in the veracity and integrity of the false information Wells Fargo furnished to Early Warning, which Early Warning then published, with both Wells Fargo and Early Warning intending that the users of the Early Warning report that contained such information would act in reliance thereon, especially with respect to Patterson's and Jordan's respective credit files.

### C.   Pattern of racketeering activity

208.   As set forth herein, Defendants have engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

209.   The Wells Fargo Defendants have established a long track record of racketeering activity consistent with their conduct in this case, having been reprimanded repeatedly for taking unauthorized harmful action against consumers, including, inter alia, purchasing car insurance for consumers who did not need or request it, opening unauthorized consumer credit and other accounts for millions of consumers in connection with practices that have come to be known as the Wells Fargo's consumer sales practices scandal, imposing unwanted mortgage modifications on consumers in bankruptcy and representing that the unwanted modifications were in fact requested by the consumers, and imposing CARES Act forbearances on consumers' mortgage loans without their prior consent and then representing falsely to the consumers and others that the consumers in fact "wanted" or requested the forbearance, among other things. This new approach to an old model is simply Wells Fargo's most recent iteration of its pattern of racketeering activity (in the form of consumer fraud) by Wells Fargo, which it has executed with the assistance and participation of Early Warning and/or LNRS and other participants in the Synthetic Identity Fraud Enterprise described herein.

210.   Each of the Defendants has committed numerous acts of racketeering activity. Racketeering activities include false identity verification, delivering false and misleading information to consumers via mail and wire, false and misleading communications to third parties, including

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

the users of Early Warning's credit reporting services with respect to Patterson and the putative class members; on information and belief, charging and collecting wire transfer, ACH, and other fees on unauthorized transactions appearing on the credit reports of Patterson, Adams and putative class members; and disseminating/publishing as true and correct, false identification information regarding Patterson, Adams, and putative class members in connection with the trade lines furnished by Wells Fargo to Early Warning and subsequently published by Early Warning in response to third party inquiries, as well as by facilitating and effectuating identity theft by Wells Fargo against Plaintiffs and the putative class members, insofar as Early Warning published to Wells Fargo, and Wells Fargo requested and accepted Plaintiffs' truthful personal identification and banking information without a legitimate purpose.

211. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the putative class members.

212. The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Defendants continue to profit from these actions.

213. As a direct and proximate result, Plaintiffs and the putative class members have been injured in their business or property or both by Defendants' predicate acts, which make up a portion of the Defendants' patterns racketeering activity.

214. Plaintiffs were injured by Defendants material omissions of fact and fraudulent identity verification, account opening, payment processing, and credit reporting, including credit damage, identity theft, reputational harm, and other pecuniary damages and general damages, as well as all other injuries and harms described herein.

215. As a result of Defendants' violations of RICO, Plaintiffs are entitled to recover and hereby seek treble actual damages and their attorneys' fees and expenses of this suit.

\\
\\
\\

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

**COUNT II**
**VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT**
**(On Behalf of Patterson, Adams, the Class, and EFTA Subclass Against WFB)**

216.  Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

217.  Plaintiffs Adams and Patterson and the putative Class and EFTA Subclass members are natural persons and therefore qualify as consumers for purposes of the EFTA.

218.  WFB is a financial institution for purposes of the EFTA because it is a National Banking Association that directly or indirectly holds Adams's and Patterson's and the putative Class and EFTA Subclass members' unauthorized consumer accounts.

219.  Adams's, Patterson's and putative Class and EFTA Subclass members' unauthorized accounts are consumer accounts for purposes of the EFTA because they are demand deposit (checking), savings, or other consumer asset accounts (other than an occasional or incidental credit balance in a credit plan) held directly or indirectly by WFB, which were ostensibly established primarily for personal, family, or household purposes.

220.  The transfer of funds by Wells Fargo from Adams's, Patterson's and putative Class and EFTA Subclass members' unauthorized consumer accounts constitute electronic fund transfers for purposes of the EFTA because they were initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account.

221.  The transfer of funds by Wells Fargo from Adams's, Patterson's and putative Class and EFTA Subclass members' unauthorized consumer accounts constitutes unauthorized electronic fund transfers because they were electronic fund transfers initiated by a person (or persons) other than the consumer without actual authority to initiate such transfer and from which the consumers received no benefit.

222.  Neither Adams, Patterson, nor putative Class and EFTA Subclass members furnished the person or persons who initiated the unauthorized electronic fund transfers with a means of accessing the consumer's account, nor were these unauthorized electronic fund transfers initiated by Adams, Patterson, or putative Class and EFTA Subclass members or any person acting in concert with the consumer with fraudulent intent.

39

223. WFB's unauthorized electronic fund transfers from Adams's, Patterson's and putative Class and EFTA Subclass members' unauthorized consumer accounts were not the result of an error committed by WFB.

224. WFB failed to make available to Adams, Patterson and putative Class and EFTA Subclass members written documentation of the unauthorized electronic fund transfers at the time such transfers were initiated, in violation of § 1693d(a) of the EFTA.

225. WFB failed to provide a periodic statement to Adams, Patterson and putative Class and EFTA Subclass members for the monthly period in which the unauthorized electronic fund transfers occurred, in violation of § 1693d(c) of the EFTA.

226. Pursuant to § 1693m(a) of the EFTA, Adams, Patterson and putative Class and EFTA Subclass members are entitled to recover damages from WFB for its violations of the EFTA, including actual damages resulting from WFB's failure to comply with the EFTA and such additional statutory damages authorized by the EFTA, as well as reasonable attorneys' fees and costs of the litigation in an amount determined by the Court.

### COUNT III
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Wells Fargo)

227. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

228. Plaintiffs and each putative Class and FCRA Subclass member is a "consumer," as that term is defined by the FCRA.

229. Wells Fargo is a "person" and a "user" of consumer credit and other financial information as those terms are defined by the FCRA.

230. The Early Warning reports obtained by Wells Fargo are "consumer report[s]" as defined by the FCRA.

231. As alleged above, Wells Fargo willfully accessed portions or all of Plaintiffs' consumer credit reports under false pretenses or knowingly without a permissible purpose and has failed to comply with 15 U.S.C. § 1681b(f) as part of their synthetic identity fraud scheme.

232. In the alternative only, Wells Fargo negligently accessed portions or all of Plaintiffs' consumer credit reports without a permissible purpose and has failed to comply with 15 U.S.C. § 1681b(f).

233. Plaintiffs were not Wells Fargo customers and did not authorize Wells Fargo to access their Early Warning reports. Wells Fargo's impermissible access to and use of Plaintiffs' private financial information held in their Early Warning reports, when Wells Fargo had knowledge that it had no legally permissible purpose to access and use that information, constitutes knowing and willful violations of the FCRA under 15 U.S.C. § 1681n, or alternatively and at a minimum, negligent violations under 15 U.S.C. § 1681o.

234. Pursuant to 15 U.S.C. §§ 1681n and/or 1681o, Wells Fargo is liable to Plaintiffs, the Class, and FCRA Subclass for their actual or statutory damages, attorneys' fees and costs, and punitive damages.

235. Plaintiffs, the Class, and FCRA Subclass have suffered actual damages, and have suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the FCRA.

236. Specifically, Plaintiffs', the Class's, and FCRA Subclass's PII has been stolen and Plaintiffs', the Class's, and FCRA Subclass's privacy has been invaded. Further, as a result of an unauthorized pull, Wells Fargo supplied false information to Early Warning that caused Plaintiffs, the Class, and FCRA Subclass reputational damage.

237. Plaintiffs, the Class, and FCRA Subclass have experienced significant stress and frustration as a result of the unauthorized pulls of their Early Warning reports by Wells Fargo.

238. The injuries suffered by Plaintiffs, the Class, and FCRA Subclass because of Wells Fargo's impermissible access to and use of Plaintiffs', the Class's, and FCRA Subclass's Early Warning reports were attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Plaintiff to punitive damages under 15 U.S.C. § 1681n(a)(2).

**COUNT IV**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**(On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Early Warning and LNRS)**

239. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

41

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

240. Plaintiffs, the Class, and FCRA Subclass are "consumer[s]," as that term is defined by the FCRA.

241. Early Warning is a "consumer reporting agency" as that term is defined by the FCRA.

242. LNRS is a "consumer reporting agency" as that term is defined by the FCRA.

243. As alleged above, Early Warning provided Wells Fargo credit reports despite the fact that Plaintiffs, the Class, and FCRA Subclass did not authorize Early Warning to provide the reports, and Wells Fargo had no permissible purpose for obtaining the reports.

244. The personal identification information provided by Wells Fargo did not match the personal identification information Early Warning had on file for Plaintiffs, yet Early Warning still provided Plaintiffs', the Class's, and FCRA Subclass's Early Warning comprehensive file disclosure (Early Warning credit report) to Wells Fargo.

245. Early Warning has failed to comply with the requirements of 15 U.S.C. § 1681b(c).

246. As alleged above, Wells Fargo requested LNRS provide identity verification services with respect to Plaintiffs' unauthorized accounts. LNRS provided Wells Fargo with information which was used (or expected to be used) in establishing eligibility for the unauthorized accounts.

247. However, the personal identification provided by Wells Fargo also did not match the personal identification information LNRS had on files for Plaintiffs – yet an identity verification report (LNRS credit report) was still provided to Wells Fargo.

248. LNRS has failed to comply with the requirements of 15 U.S.C. § 1681b(c).

249. Plaintiffs, the Class, and FCRA Subclass were not Wells Fargo customers and did not authorize Early Warning or LNRS to publish their reports to Wells Fargo, and there was no permissible reason for Early Warning or LNRS to provide Wells Fargo with Plaintiffs', the Class's, and FCRA Subclass's reports.  Early Warning's and LNRS's unauthorized publication to Wells Fargo of Plaintiffs', the Class's, and FCRA Subclass's reports constitutes knowing and willful violations of the FCRA under 15 U.S.C. § 1681n, or alternatively and at a minimum, negligent violations under 15 U.S.C. § 1681o.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

250. Pursuant to 15 U.S.C. §§ 1681n and/or 1681o, Early Warning and/or LNRS are liable to Plaintiffs, the Class, and FCRA Subclass for their actual or statutory damages, attorneys' fees and costs, and punitive damages.

251. Plaintiffs, the Class, and FCRA Subclass have suffered actual damages, and have suffered physically, mentally, and emotionally as a result of Early Warning's and LNRS's willful violations of the Fair Credit Reporting Act.

252. Specifically, Plaintiffs', the Class's, and FCRA Subclass's personal identifiable information has been stolen and Plaintiffs', the Class's, and FCRA Subclass's privacy has been invaded. Further, as a result of the unauthorized publication, Wells Fargo provided false information about Plaintiffs, the Class, and FCRA Subclass that appeared on their reports that caused reputational damage.

253. Plaintiffs, the Class, and FCRA Subclass have also experienced significant stress and frustration as a result of the unauthorized publication.

254. Plaintiffs, the Class, and FCRA Subclass have also been damaged in connection with Early Warning's and LNRS's unauthorized publication of their reports to Wells Fargo.

255. The injuries suffered by Plaintiffs, the Class, and FCRA Subclass because of Early Warning's and LNRS's unauthorized publication of his credit report to Wells Fargo were attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Plaintiffs, the Class, and FCRA Subclass to punitive damages under 15 U.S.C. § 1681n(a)(2).

**COUNT V**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**(On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Early Warning and LNRS)**

256. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

257. Plaintiffs, the Class, and FCRA Subclass are "consumer[s]," as that term is defined by the FCRA.

258. As consumer reporting agencies under the FCRA, both Early Warning and LNRS have statutory obligations to use reasonable procedures to ensure the maximum possible accuracy of their reports. 15 U.S.C. 1681e(b).

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

259. EWS's and LNRS's conduct, as alleged above, demonstrates EWS and LNRS have failed to establish or follow reasonable procedures to assure maximum possible accuracy of consumer reports in violation of 15 U.S.C. 1681e(b).

260. As a result of Early Warning's and LNRS's misconduct, Plaintiffs and putative class members suffered damages to their reputations, been victims of fraud, subjected to increased risk of credit denial, and other concrete actual harm.

261. Defendants LNRS's and Early Warning's violations of 15 U.S.C. 1681e(b) were willful, rendering them liable pursuant to 15 U.S.C. 1681n. In the alternative, LNRS and Early Warning were negligent, entitling Plaintiffs to recover under 15 U.S.C. 1681o.

262. Plaintiffs and the putative class members are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n.

## COUNT VI
## THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT
### (On Behalf of Jordan and CCRAA Subclass Against Wells Fargo and Early Warning)

263. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

264. Jordan is a consumer as the terms is defined by California Civil Code § 1785.3(b).

265. Defendants are "persons" as the term is defined in California Civil Code § 1785.3(l).

266. Under California law, liability can be attached to any "person who knowingly and willfully obtains access to a file other than as provided in Section 1785.11[and/or] knowingly and willfully obtains data from a file other than as provided in Section 1785.11 . . .." California Civil Code § 1785.19(a)(1)-(2).

267. There are several permissible purposes for which a person or entity may gain access to a consumer's credit file. Such permissible purposes include, but are not limited to, (a) gaining access to a consumer's credit file "[i]n accordance with the written instructions of the consumer to whom it relates[;]" (b) providing access to someone a consumer credit reporting agency believes "[i]ntends to use the information in connection with a credit transaction;" and (c) providing access to someone a consumer credit reporting agency believes "[o]therwise has a

44

legitimate business need for the information in connection with a business transaction involving the consumer." California Civil Code § 1785.11(a)(2)-(3)(A), (F).

268.  Additionally, except under limited circumstances, "a consumer credit reporting agency shall not furnish to any person a record of inquiries solely resulting from credit transactions that are not initiated by the consumer." California Civil Code § 1785.11(c)

269.  Jordan accessed her credit report from Early Warning on August 4, 2023, which revealed that Wells Fargo accessed Jordan's Early Warning credit report on October 16, 2021, and October 19, 2021, respectively, despite receiving reassurance from Wells Fargo that it had removed inaccuracies from Jordan's credit file.

270.  Jordan never authorized Wells Fargo, in writing or otherwise, to access her Early Warning credit file because, as explained above, Jordan has never applied for, opened, or held any account with Wells Fargo.

271.  Jordan's Early Warning report further reflected other credit inquiries from entities other than Wells Fargo which postdated Wells Fargo's credit inquiries, i.e., an inquiry from Capital One on April 6, 2023, and GEICO on August 7, 2023.

272.  On information and belief, Early Warning furnished its record of inquiries for Jordan, including the impermissible inquiries from Wells Fargo, to both Capital One and GEICO.

273.  Jordan and the CCRAA Subclass suffered damages as a result of Defendants' conduct.

274.  Defendants have demonstrated willful violations of the CCRAA in that (a) Wells Fargo inquired into Jordan's and the CCRAA Subclass's Early Warning credit files despite knowing that it had no permissible purpose in doing so and (b) Early Warning continues to report Wells Fargo's inquires despite knowing that Wells Fargo had no permissible purpose in making those inquiries in the first place.

275.  For instance, in Jordan's case, Early Warning continued to report Wells Fargo's inquiries after Wells Fargo had informed Jordan that it removed information related to the unauthorized account that was opened in her name.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

276. Alternatively, Defendants' conduct was negligent. First, Wells Fargo owed a statutory duty to Jordan and the CCRAA Subclass of not inquiring into their credit files without a permissible purpose. Wells Fargo breached that duty by nevertheless inquiring into Jordan's and the CCRAA Subclass's Early Warning credit files without a permissible purpose. Jordan and the CCRAA Subclass were then harmed by Wells Fargo's inquiries because Wells Fargo accessed sensitive PII and PFI without their permission, thereby invading their privacy. Wells Fargo's breach was the proximate and but-for cause of Jordan's and the CCRAA Subclass's injuries.

277. Second, Early Warning owed statutory duties to Jordan and the CCRAA Subclass of (a) not allowing Wells Fargo to accesses their credit files without a permissible purpose and (b) not furnishing to any person a record of inquiries solely resulting from credit transactions that are not initiated by the consumer. Early Warning breached those duties by (a) granting Wells Fargo access to Jordan's and the CCRAA Subclass members' credit files and (b) furnishing to Capital One and GEICO a record of inquiries solely resulting from credit transactions that were not initiated by Jordan and the CCRAA Subclass members.

278. Consequently, Jordan and the CCRAA Subclass are entitled actual damages, punitive damages of no less than $2,500 and no more than $5,000 per violation, reasonable attorneys' fees and costs, injunctive relief, and any other relief that the Court deems proper.

## COUNT VII
## NEGLIGENCE / GROSS NEGLIGENCE
### (On Behalf of Plaintiffs and the Classes Against All Defendants)

279. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

280. Wells Fargo owed Plaintiffs and the Classes and the putative class members a duty to prevent the opening of unauthorized accounts in their names.

281. Wells Fargo owed Plaintiffs and the putative Classes a duty to identify, investigate, and close any unauthorized accounts it opened in the names of Plaintiffs and members of the putative Classes upon learning that the personal identification information Wells Fargo associated with these unauthorized accounts was contrary to and incompatible with the personal identification

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

information provided on Early Warning's consumer reports' trade lines for the other financial institutions where Plaintiffs and members of the putative Classes had pre-existing accounts.

282. Wells Fargo owed Plaintiffs and members of the putative Classes a duty to prevent the processing of unauthorized electronic funds transfer transactions in Plaintiffs' and class members' names.

283. Wells Fargo owed Plaintiffs and the putative class members a duty to inform Plaintiffs and the putative class members when it became aware that it had opened bank accounts in their names using false personal identification information.

284. Wells Fargo owed Plaintiffs and the putative class members a duty to inform Plaintiffs and the putative class members that it processed electronic funds transfers using the unauthorized accounts it opened in their names.

285. Early Warning and/or LNRS owed Plaintiffs and the putative class members a duty to not falsely verify Plaintiffs' and the putative class members' identities in response to Wells Fargo's consumer identity verification request based on false PII for the Plaintiffs and putative class members, which was inconsistent with the PII Early Warning and/or LNRS associated with the Plaintiffs and putative class members' pre-existing bank accounts.

286. Early Warning and/or LNRS owed Plaintiffs and the putative class members a duty to inform Wells Fargo that the personal identification information Wells Fargo associated with the Plaintiffs' and putative class members' accounts was false, incompatible with, and/or contrary to the personal identification information Early Warning and/or LNRS associated with Plaintiffs' and the putative class members' existing bank accounts.

287. Wells Fargo, Early Warning, and/or LNRS breached these duties.

288. Wells Fargo breached its duty to prevent the opening of unauthorized accounts in Plaintiffs' and the other class members' names by opening the unauthorized accounts described herein.

289. Wells Fargo breached its duty to identify, investigate, and close any unauthorized accounts it opened in Plaintiffs' and the putative class members' names upon learning that the personal identification information Wells Fargo associated with these unauthorized accounts was

47

contrary to and incompatible with the personal identification information provided on Early Warning's consumer reports' trade lines for the other financial institutions where Plaintiffs and the putative class members had pre-existing accounts when it failed to take these actions after obtaining Plaintiffs' and the putative class members' Early Warning credit reports upon opening the unauthorized bank accounts in Plaintiffs' and the putative class members' names.

290. As set forth herein, Wells Fargo breached its duty to Plaintiffs and the putative class members to prevent the processing of unauthorized electronic funds transfer transactions in Plaintiffs' and the putative class members' names.

291. Wells Fargo breached its duty to inform Plaintiffs and the putative class members that it had opened fraudulent bank accounts in their names when it became aware that it had opened bank accounts in their names using false personal identification information.

292. Wells Fargo breached its duty to inform Plaintiffs and the putative class members that it processed electronic funds transfers using the unauthorized accounts it opened in their names.

293. Early Warning and/or LNRS breached its duty to Plaintiffs and the putative class members to not falsely verify Plaintiffs' and the putative class members' identities in response to Wells Fargo's consumer identity verification request that was based on false PII for the Plaintiffs and putative class members, which was inconsistent with the PII Early Warning and/or LNRS associated with the Plaintiffs' and putative class members' pre-existing bank accounts.

294. On information and belief, Early Warning and/or LNRS breached its duty to Plaintiffs and the putative class members to inform Wells Fargo that the personal identification information Wells Fargo associated with the Plaintiffs' and putative class members' accounts was false, incompatible with, and/or contrary to the personal identification information Early Warning and/or LNRS associated with Plaintiffs' and the putative class members' existing bank accounts.

295. At best, each of the Defendants' breaches of these duties was a result of the Defendants' failure to use ordinary care.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

296.    Given the extreme importance and sensitivity of the personal identification and personal financial information that was at issue in connection with the Defendants' opening of these accounts and identity verification procedures, and given the obvious inaccuracies in the personal identification information that Wells Fargo associated with Plaintiffs' and the putative class members' unauthorized accounts, Defendants' breach of the foregoing duties represented a wanton failure by Defendants to use even slight care. Had Defendants compared the personal identification information they associated with the unauthorized accounts against the personal identification information associated with the Plaintiffs' and class members' existing bank accounts, the discrepancies would have been obvious and would have clearly established that the unauthorized Wells Fargo accounts were the product of synthetic identity fraud, which Defendants knew and actively understood to be a major security threat at the time that they verified the identities of the consumers associated with these unauthorized accounts.

297.    Defendants' failure to identify and address these material discrepancies in the personal identification information associated with Plaintiffs' and the putative class members' accounts represents Defendants' intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.

298.    As a result of Defendants' breaches of these duties, Plaintiffs and the putative class members have been injured, suffering reputational harm, identity theft, emotional distress, frustration, and anxiety over the potential consequences of having their sensitive personal identification information and personal financial information disclosed, revealed, and/or stolen without their consent.

299.    As a result of Defendants' breaches of these duties, Plaintiffs and the putative class members have been injured, suffering reputational harm, identity theft, emotional distress, frustration, and anxiety over the potential consequences of Wells Fargo processing unauthorized electronic funds transfers in their names using these unauthorized consumer checking accounts.

300.    But for and as a proximate result of Defendants' breaches of these duties, Plaintiffs and the putative class members would not have suffered these harms or incurred these losses.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

301. Because Defendants' breaches of these duties were wanton and demonstrated a reckless disregard for obvious likelihood of harms to Plaintiffs and the putative class members, which harms Plaintiffs and the putative class members in fact experienced, Plaintiffs and the putative class members are entitled to recover punitive damages from Defendants for their gross negligence.

302. Plaintiffs have incurred damages as a consequence of Defendants' negligence and/or gross negligence.

## VII.  REQUEST FOR DECLARATORY RELIEF

303. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

304. As outlined in the preceding counts and the preceding factual allegations, Defendants have violated RICO, the FCRA, and the EFTA.

305. Plaintiffs seek a declaration that Defendants' conduct as described herein violates RICO, the FCRA, and the EFTA.

## VIII.  REQUEST FOR INJUNCTIVE RELIEF

306. Plaintiffs repeat and reallege the allegations in this First Amended Complaint.

307. To the extent monetary remedies are in some ways inherently inadequate in circumstances involving identity theft, and to the extent that Wells Fargo continues to retain and have access to the use of Plaintiffs' and the putative class members' personal identification and banking history information, Wells Fargo should also be enjoined from the use, publication, transfer, or sale of any personal or other information regarding Plaintiffs or any putative class member for any purpose whatsoever and instructed to completely and permanently delete and destroy all electronic and physical copies of Plaintiffs' and the putative class members' personal identification and banking information, and to notify every entity that made inquiry to Early Warning and/or LNRS regarding Plaintiffs or any class member at a time when Early Warning and/or LNRS included trade line information Wells Fargo furnished regarding an unauthorized Wells Fargo account opened by Wells Fargo as a result of synthetic identity fraud, that all of

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

the information Wells Fargo furnished to and published by Early Warning and/or LNRS to such inquiring party regarding Wells Fargo's unauthorized account in the name of Plaintiffs or any putative class member was false.

## IX. PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the putative class members, pray that the Court grant Plaintiffs the following relief against Defendants and each of them:

- that this action be certified as a class action;
- that Plaintiffs be appointed as the representatives of the Classes;
- that Plaintiffs' attorneys be appointed Class Counsel;
- actual damages
- statutory damages;
- punitive damages;
- declaratory relief;
- injunctive relief;
- costs of suit;
- reasonable attorneys' fees;
- and all such other and further relief as the Court deems just and proper in light of Defendants' misconduct and Plaintiffs' and the putative class members' injuries alleged herein.

## X. TRIAL BY JURY

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiffs are entitled to and demand a trial by jury.

Respectfully submitted,

*/s/ Abbas Kazerounian, Esq.*
Abbas Kazerounian, Esq. (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Ave, Suite D1

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Costa Mesa, CA 92626
ak@kazlg.com
(800) 400-6808; Fax 1-800-520-5523

*/s/ Theodore ("Thad") O. Bartholow, III*
Theodore ("Thad") O. Bartholow III
Texas State Bar No. 24062602
(*Pro Hac Vice*)
KELLETT & BARTHOLOW PLLC
11300 N. Central Expressway, Suite 301
Dallas, TX 75243
Tel.: (214) 696-9000
Fax: (214) 696-9001
thad@kblawtx.com

*Attorneys for Plaintiff Bernard J. Patterson*

FIRST AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT