Abbas Kazerounian, Esq. (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Ave, Suite D1
Costa Mesa, CA 92626
ak@kazlg.com
(800) 400-6808; Fax (800) 520-5523

Theodore O. Bartholow, III (*pro hac vice*)
KELLETT & BARTHOLOW PLLC
11300 N. Central Expy., Suite 301
Dallas, TX 75243
thad@kblawtx.com
(214) 696-9000; Fax (214) 696-9001

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BERNARD J. PATTERSON; JOSHUA P. ADAMS; LINDA G. JORDAN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & CO.; WELLS FARGO BANK, N.A.; EARLY WARNING SERVICES, LLC; LEXISNEXIS RISK SOLUTIONS INC., <br><br> Defendants. | Case No.: 3:23-cv-03858-TLT <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:** <br><br> **1) THE FAIR CREDIT REPORTING ACT;** <br> **2) THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT.** <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Bernard J. Patterson ("Patterson"), Joshua P. Adams ("Adams"), and Linda G. Jordan ("Jordan") (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action complaint against defendants Wells Fargo & Co. ("WFC"); Wells Fargo Bank, N.A. ("WFB") (WFC together with WFB shall be referred to as "Wells Fargo"); and Early Warning Services, LLC ("Early Warning") (collectively, the "Defendants"), and allege as follows:

# I.  INTRODUCTION

1.  Just as one Wells Fargo fake account scandal concludes, another emerges. This time, Defendants are engaging in and/or enabling a practice known as synthetic identity fraud, which is where fraudsters (with Defendants' witting or unwitting assistance) use a combination of fake and real personal identification information ("PII") to open unauthorized accounts in their consumer victims' names. Wells Fargo knows better than to open these accounts in the victims' names because, before opening the accounts, Wells Fargo obtains its victims' true and correct PII from a third-party identity verification service, LexisNexis Risk Solutions FL Inc. ("LNRS"), which is incompatible with the information associated with the synthetic identity fraud accounts. With these unauthorized accounts thus opened, Wells Fargo secretly processes unauthorized electronic fund transfer transactions in victims' names using these unauthorized accounts (money laundering), and, with assistance from Early Warning, Wells Fargo also fraudulently obtains its victims' credit reports and the valuable true and correct personal identification and personal financial information ("PFI") therein.

2.  Wells Fargo and Early Warning also corrupt the consumers' Early Warning credit files with the fraudulent and derogatory unauthorized transaction information and false PII which Wells Fargo furnishes to Early Warning with respect to the synthetic identity fraud accounts.

# II.  PARTIES

3.  Patterson, a natural person, is a resident of the state of Arkansas. Patterson works as a forensic accounting expert specializing in mortgage servicing-related accounting issues. He has provided expert services in hundreds of litigated matters in courts throughout the United States, including numerous cases involving Wells Fargo's mortgage servicing business. Because of the nature of his work, Patterson has consciously avoided opening bank accounts with financial institutions – like Wells Fargo – that are engaged in the mortgage servicing business.

4.  Adams, a natural person, is a resident of the state of West Virginia. Adams has never applied for, opened, or held any account with Wells Fargo due, in part, to the lack of Wells Fargo-operated bank branches in his area.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

5.      Jordan, a natural person, is a resident of the state of California. Jordan, like the other Plaintiffs, has never applied for, opened, or voluntarily held any account with Wells Fargo.

6.      WFC is a diversified financial services company headquartered in San Francisco, California. WFC provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.  WFC may be served through its registered agent, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, CA 95833.

7.      WFB is a national banking association that is WFC's principal subsidiary.  While WFB's designated "headquarters" (for purposes of the National Bank Act) is in Sioux Falls, South Dakota, WFB's actual principal place of business is in San Francisco, California. WFB is also one of seven major U.S. Banks that founded and own Early Warning.  WFB may be served through Corporation Service Company d/b/a CSC-Lawyers Incorporation Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833. Among other things, WFB provides personal and commercial banking services.

8.      Early Warning is a Delaware limited liability corporation, which may be served with process via its registered agent, Cogency Global, Inc., 1325 J Street, Suite 1550, Sacramento, CA 95814. Early Warning is a business that Wells Fargo and the nation's six other largest banks collectively established and continue to collectively own and operate.

9.      Early Warning's foundational business is a specialty credit reporting agency that collects and publishes detailed "tradeline" information[1] regarding consumers' personal and business bank accounts. Leveraging the vast database of PII Early Warning obtains from financial institutions that furnish consumer tradeline information to it, Early Warning provides identity verification and banking background check services to banks and other financial service businesses when

---

[1] "A tradeline is information about a consumer account that is sent . . . to a consumer reporting agency. Tradelines contain data such as the account balance, payment history, and the status of the account[.]" Consumer Financial Protection Bureau, Market Snapshot: Third-Party Debt Collections Tradeline Reporting (July 2019), https://files.consumerfinance.gov/f/documents/201907_cfpb_third-party-debt-collections_report.pdf.

they open new consumer accounts, acts as an information security service provider that claims to specialize in identification and prevention of identity fraud, and owns and operates the well-known peer-to-peer electronic funds transfer system, "Zelle."

### III.  JURISDICTION AND VENUE

10.  The Court has jurisdiction over the lawsuit because the suit arises under the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681.

11.  This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant.  On information and belief, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.  The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

13.  This Court has general personal jurisdiction over Wells Fargo because their principal place of business is in San Francisco, California.

14.  This Court also has general personal jurisdiction over Wells Fargo because their respective contacts with California are so constant and pervasive as to render them essentially at home in California.

15.  The exercise of specific personal jurisdiction over all Defendants is consistent with due process, as all Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from services provided to, persons in this District and in California.

16.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has jurisdiction over Defendants, and Defendants have sufficient contacts with this District, the situs of Wells Fargo's principal place of business.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

17.   Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

## IV.  INTRADISTRICT ASSIGNMENT

18.   Because Wells Fargo's principal place of business is in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the United States District Court for the Northern District of California.

## V.  FACTUAL ALLEGATIONS

### Summary of Defendants' Wrongdoing

19.   WFB opened unauthorized consumer checking accounts in victims' names without their knowledge or consent.[2] Many of Defendants' victims, including Plaintiffs, had no pre-existing business relationship with Wells Fargo.

20.   On information and belief, WFB contracted the services of LNRS to provide WFB with the delivery of identity verification and "Know Your Customer" ("KYC") services for the opening of new consumer banking accounts.[3]

21.   On information and belief, WFB also contracted the services of Early Warning to provide WFB with additional identity verification services as well as risk assessment reporting services for the opening of new consumer banking accounts.

22.   Early Warning offers a variety of "New Account Opening Capability Bundles," which include services allowing its users, like Wells Fargo, to (a) "determine, in real time, the likelihood that an applicant is who they claim to be so [that a user] can expand [its] customer base with

---

[2] The practices described herein are separate and distinct from Wells Fargo's well-documented and relatively recent so-called "sales practices" scandal, in which Wells Fargo's employees secretly opened consumer accounts for millions of existing Wells Fargo customers in order to meet unrealistic sales goals/requirements imposed upon them by Wells Fargo.

[3] KYC is a financial/investment industry standard for identity verification with three components: (1) customer identification program, (2) customer due diligence, and (3) enhanced due diligence. *See also* Financial Industry Regulatory Authority Rule 2090 (https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

confidence"; (b) predict new account risks, allowing its users to "make more nuanced risk assessments"; and (c) "expand [users'] credit-decisioning criteria by using contributed account data to provide additional credit products to consumers with little or no credit history."[4] Early Warning also markets these services to financial institutions (including its owner institutions) with claims that it can help "meet compliance requirements."[5]

23.   As part of its "Predict New Account Risk" service, Early Warning provides "deep predictive intelligence required to make nuanced risk assessments—that go beyond rigid 'yes' or 'no' decision rules."[6] For instance, Early Warning provides its users with "[i]nsight into an applicant's deposit account history" and "combines risk scores with summarized attributes to predict the likelihood that an individual's account will be closed due to first-party fraud or account mismanagement within the first nine months."[7]

24.   Early Warning has offered versions of its "Predict New Account Risk" service as early as 2019.[8]

25.   On information and belief, Wells Fargo uses the incorrect and/or incomplete PII provided to it by the fraudulent consumer checking account applicants to verify the identity of said applicants with LNRS, and in that process, retrieves "multiple levels of detailed information, including name variations . . . and address variations with dates associated."[9]

---

[4] https://www.earlywarning.com/products (last accessed July 9, 2024).

[5] *Verify Identity*, EARLY WARNING, https://www.earlywarning.com/products/verify-identity (last visited July 9, 2024); *Predict New Account Risk*, EARLY WARNING, https://www.earlywarning.com/products/predict-new-account-risk (last visited July 9, 2024); *Expand Credit Insights*, EARLY WARNING, https://www.earlywarning.com/products/expand-credit-insights (last visited July 9, 2024).

[6] https://www.earlywarning.com/sites/default/files/2023-09/Predict%20New%20Account%20Risk%20Product%20Brief.pdf (last accessed July 9, 2024).

[7] *Ibid.*

[8] https://www.earlywarning.com/sites/default/files/2019-05/ew_product_brief_real-time_identity_chek_nas.pdf (last accessed July 9, 2024).

[9] https://risk.lexisnexis.com/products/instantid (last accessed June 13, 2024).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

26.     Despite being on notice of the inconsistent PII used by applicants seeking to open unauthorized Wells Fargo checking accounts, on information and belief, Wells Fargo nevertheless utilizes the "detailed information" it receives from LNRS and incorrect and/or incomplete PII it receives from its applicants, to retrieve even more information on Plaintiffs and putative class members from Early Warning's "Predict New Account Risk" service after opening consumer checking accounts in the Plaintiffs' and putative class members' names, even though the applicants are clearly not who they claim they are.

27.     Early Warning also knew that the PII associated with Wells Fargo's unauthorized bank accounts did not match the PII that Early Warning's other member institutions had furnished to Early Warning regarding the victims' legitimate bank accounts.

28.     Yet, on information and belief, Early Warning falsely provided Wells Fargo "[i]nsight into [Plaintiffs' and other victims'] deposit account history[,]"[10] at Wells Fargo's request. Despite the inconsistencies in Plaintiffs' PII provided by Wells Fargo, Early Warning allowed Wells Fargo to obtain Plaintiffs' consumer reporting information.

29.     Once unauthorized consumer checking accounts were opened, WFB then permitted the accounts to be used to process unauthorized financial transactions in Plaintiffs' names. WFB also reported these accounts and their transactions to Early Warning.

30.     In Patterson's case, WFB approved a transfer of at least $4,992 to an unknown third party via ACH using the unauthorized account Wells Fargo opened in Patterson's name.

31.     Similarly, WFB sent Adams a statement for an unauthorized checking account with a starting balance of $195.40, a Monthly Service Fee subtraction of $10.00, and an ending balance of $185.40.

32.     WFB also sent Jordan a bank statement for an unauthorized checking account with a $0.00 balance.

33.     Patterson and Adams do not know what the source of this money was, who it belonged to, or how it came to be in their unauthorized Wells Fargo accounts.

---

[10] *See, supra*, nn.6-7.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

34. Despite having actual knowledge that the PII it associated with the victims' accounts was false and contradicted by the PII associated with the victims' other legitimate bank accounts included on Early Warning's consumer credit reports and LNRS's identity verification process, Wells Fargo intentionally furnished false and defamatory trade line information to Early Warning regarding the unauthorized consumer checking accounts it opened in the victims' names.

35. In turn, despite knowing that the alleged PII associated with Wells Fargo's victims' accounts was false and contradicted by the PII furnished by the financial institutions where the victims maintained legitimate bank accounts, upon information and belief, Early Warning repeatedly published this false and defamatory trade line information on Plaintiffs' and other victims' credit reports—including false PII and false PFI regarding account status, unauthorized transactions, and account balances—for the victims' unauthorized Wells Fargo accounts. On information and belief, Early Warning provided the inaccurate credit reporting information for Plaintiffs in response to inquiries from various third parties.

36. Even after acknowledging that victims' accounts were opened fraudulently, Defendants have failed to inform the recipients of their previously published false and defamatory trade line information regarding the victims' unauthorized bank accounts that such information was false.

37. To Plaintiffs' knowledge, to this day, these errors have not been cured.

38. Plaintiffs were harmed as a result of Defendants' conduct.

**Plaintiff Bernard J. Patterson's Experience**

39. Without his prior knowledge or consent, on March 10, 2022, Wells Fargo opened a consumer checking account in Patterson's name.

40. The personal identification information for Patterson that Wells Fargo associated with the unauthorized Patterson account included a combination of true PII (specifically his full name, address, and social security number), and false PII (including false birthday, telephone number, driver's license state, driver's license number, driver's license expiration date, and email address).

41. On information and belief, in connection with opening the unauthorized Patterson account, Wells Fargo used LNRS's identity verification services to falsely verify Patterson's identity even though LNRS informed Wells Fargo that it had demonstrably false non-public PII for Patterson, which was incompatible with the otherwise consistent and correct non-public PII that financial institutions maintained on Patterson's legitimate accounts furnished to LNRS.

42. Despite being on notice of the inconsistent and incorrect PII it possessed for Patterson, Wells Fargo nevertheless proceeded with utilizing Early Warning's services to gain "[i]nsight into [Patterson's] deposit account history" and decided to open a consumer checking account in Patterson's name without Patterson's knowledge or consent.[11]

43. At the time Wells Fargo opened the unauthorized Patterson account, Patterson's full name and address were publicly available through property tax records, court filings, and other official records.

44. Of the true and correct PII Wells Fargo associated with the unauthorized Patterson account, only his social security number was (ostensibly) non-public information.

45. Patterson did not provide Wells Fargo with any of his confidential PII.

46. Patterson did not want a bank account with Wells Fargo and did not request or authorize anyone to request that Wells Fargo set up a bank account in his name.

47. Patterson has never previously opened a checking account with Wells Fargo, and at the time that Wells Fargo opened the unauthorized Patterson account, Patterson had no pre-existing business relationship with Wells Fargo.

48. On March 10, 2022, the day when Wells Fargo initially opened the unauthorized Patterson account, Wells Fargo used LNRS to provide so-called "identity verification" services in connection with opening the fraudulent Patterson account.

---

[11] *Predict New Account Risk*, EARLY WARNING, https://www.earlywarning.com/products/predict-new-account-risk (last visited June 17, 2024).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

49. On March 11, 2022, the day after Wells Fargo initially opened the unauthorized Patterson account, Wells Fargo inquired into Early Warning's credit report for Patterson, also without Patterson's knowledge or consent.

50. On information and belief, Wells Fargo had no permissible purpose in inquiring into Early Warning's credit report for Patterson because it had already attempted to verify Patterson's identity with LNRS, was on notice that the PII provided by the applicant was incorrect, and had already proceeded with opening an account in Patterson's name the day before inquiring into Patterson's Early Warning credit report.

51. Wells Fargo had no right to obtain Patterson's Early Warning credit report, and Early Warning had no reason to believe that Wells Fargo had a right to obtain Patterson's Early Warning credit report, especially considering the false PII associated with the Wells Fargo account, which was inconsistent with the PII Early Warning already had on file for Patterson.

52. Early Warning's credit report for Patterson includes trade lines for all of Patterson's business and personal bank accounts. Each of these trade lines includes current and historical balance and transaction information for each of the relevant accounts, which is information Patterson's banks regularly furnish to Early Warning. Each of these trade lines also includes Patterson's PII, which is also furnished to Early Warning by Patterson's banks. Other than the trade line for Wells Fargo's unauthorized Patterson account, the trade lines on Patterson's Early Warning credit report contain accurate PII for Patterson.

53. While not all the trade lines on Patterson's Early Warning report include Patterson's driver's license information, the trade lines on Patterson's Early Warning credit report that did include his driver's license information were accurate and incompatible with the information provided by Wells Fargo for the Patterson unauthorized account.

54. Patterson never put money into or withdrew money out of Wells Fargo's unauthorized Patterson account.

55. On June 17, 2022, more than three months after Wells Fargo opened the unauthorized Patterson account, Patterson received his first monthly checking account statement from Wells Fargo for

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

that account. Wells Fargo's statement is dated June 7, 2022. This was the first time that Patterson had any knowledge about Wells Fargo's unauthorized Patterson account.

56.     Patterson and his wife were in the process of obtaining a mortgage for the purchase of a home in Arkansas prior to and around the same time that he became aware that Wells Fargo opened the unauthorized bank account in his name. Indeed, Wells Fargo's statements for the unauthorized Patterson account advertised Wells Fargo's mortgage loan products.

57.     This June 7, 2022, statement from Wells Fargo for the unauthorized Patterson account listed a balance of $12.00 in the account. The statement did not include information that would explain when or how the $12.00 balance came to be in the unauthorized Patterson account, and it did not reveal any prior transaction activity on the account.

58.     Within approximately 20 minutes of opening his mail to discover Wells Fargo's June 7, 2022, statement for the unauthorized account, Patterson contacted Wells Fargo by telephone to try to find out what was going on / why he received a statement for a bank account he never opened.

59.     Patterson navigated Wells Fargo's interactive voice response ("IVR") pre-recorded telephone message tree to request customer service and, after being on hold for a while, Patterson was eventually able to speak with a Wells Fargo representative.

60.     After providing his name and the account number for the unauthorized account to the Wells Fargo representative, Patterson informed the representative that he in fact had no account with Wells Fargo and never has had an account with Wells Fargo.

61.     After hearing this, the Wells Fargo representative would only tell Patterson that the account was opened in March of 2022, before transferring Patterson to another Wells Fargo representative.

62.     The second Wells Fargo representative with whom Patterson spoke on his June 17, 2022, telephone call with Wells Fargo informed Patterson that Wells Fargo would "put a freeze" on the account. The purpose or alleged effect of this "freeze" on the unauthorized account was not explained to Patterson, and the second Wells Fargo representative indicated that she was unable to tell Patterson anything else about the unauthorized account Wells Fargo opened in his name.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

63. Wells Fargo sent Patterson a letter dated June 24, 2022, in which it confirmed that Patterson did not open or have knowledge of any account with Wells Fargo.

64. Concerned that the unauthorized account Wells Fargo opened in his name could be a sign that he was the victim of identity theft and that he was therefore at risk of incurring financial losses as a result, Patterson pulled his credit reports from Experian, Equifax, and Transunion, the "big three" consumer credit reporting agencies, on June 17, 2022.

65. None of Patterson's June 17, 2022, Experian, Equifax, or Transunion credit reports revealed any new account with Wells Fargo or any other new account or suspicious transaction activity.

66. Patterson's PII on each of these reports was, however, true and correct – and thus contrary to most of the PII associated with Wells Fargo's unauthorized Patterson account.

67. Patterson then pulled his credit report from ChexSystems, a consumer credit reporting agency specializing in reporting consumers' checking account usage, which also contained no reference to Wells Fargo's unauthorized Patterson account.

68. On August 2, 2022, Patterson pulled his credit file disclosure from Early Warning, which he had identified as a specialty credit reporting agency and identity verification service provider that Wells Fargo uses to "verify" new customer identities when opening consumer banking accounts and to whom Wells Fargo reports information regarding consumers' personal and business bank accounts.

69. Patterson's August 2, 2022, Early Warning credit file disclosure includes years of his historical personal and business banking transactions and account balances, all of which is valuable consumer data for Wells Fargo, which specializes in marketing its financial products to consumers based on the products that Wells Fargo anticipates its customers will need based on their financial circumstances.

70. Patterson's Early Warning file disclosure dated August 2, 2022, revealed that, without Patterson's knowledge or consent, *months prior to sending Patterson the June 7, 2022, statement*, Wells Fargo had in fact processed four ACH transactions using the unauthorized Patterson account. None of these transactions were disclosed or referenced on the June 7, 2022,

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Wells Fargo account statement for the unauthorized Patterson account, and Patterson had no prior knowledge of these transactions before he received the August 2, 2022, Early Warning file disclosure.

71.   Patterson's Early Warning file disclosure revealed that, without Mr. Patterson's knowledge or consent, Wells Fargo used the unauthorized Patterson account to move $4,992.00 on March 23, 2022, via ACH from the unauthorized Patterson account to a bank account associated with Peoples' United Bank.

72.   Patterson does not have any account with Peoples' United Bank and did not authorize any transfer of funds from any account in his name to any account with Peoples' United Bank.

73.   Patterson's August 2, 2022, Early Warning credit file disclosure revealed to Patterson for the first time that Wells Fargo processed or attempted to process three more ACH transactions between April and May of 2022 using the unauthorized Patterson account. Each attempted ACH transaction was in the amount of $5,000.00, and all were "returned" due to "insufficient funds." Mr. Patterson did not know about or authorize any of these returned transactions that Wells Fargo reported on its trade line for the unauthorized Patterson account, which are considered derogatory statements that hurt Patterson's credit rating.

74.   Having a transaction reported as returned due to insufficient funds is considered a derogatory mark on a consumer's credit history and can negatively affect a consumer's ability to open accounts and/or obtain credit.

75.   Although Wells Fargo acknowledged, in its June 24, 2022, letter to Patterson, that the unauthorized account was not Patterson's responsibility, the Wells Fargo trade line for that account on Patterson's August 2, 2022, Early Warning file disclosure does not reflect that the account was opened fraudulently or that Patterson was potentially the victim of identity theft.

76.   By the time Patterson first obtained his Early Warning credit file disclosure on August 2, 2022, Wells Fargo had already determined that his account was opened fraudulently and without his authorization, yet Wells Fargo failed to update the trade line for the account with Early Warning to include any reference to or mention of fraud or identity theft.

13

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

77. Indeed, after June 17, 2022, Wells Fargo made adjustments to the trade line for the unauthorized Patterson account, including noting that the account was closed as of July 6, 2022.

78.  Aside from calling Wells Fargo on June 17, 2022, Patterson had no direct role in closing this account.

79. Wells Fargo's trade line on Patterson's August 2, 2022, Early Warning file disclosure does not explain why the account remained open for 12 days after Wells Fargo sent Patterson correspondence on June 24, 2022, confirming that Wells Fargo knew that Patterson did not open or know of the account.

80. Despite having acknowledged to Patterson that the account was opened without his knowledge, Wells Fargo continued to report the existence of the four unauthorized and fraudulent ACH transactions that Wells Fargo processed using that account, three of which were ACH transactions Wells Fargo continued to falsely report as returned due to insufficient funds.

81. Patterson's August 2, 2022, Early Warning file disclosure indicated that two entities inquired with Early Warning after Wells Fargo opened the unauthorized Patterson account. Among the listed inquiries was an inquiry by Wells Fargo, which occurred the day after it opened the unauthorized Patterson account. The other inquiry disclosed on the August 2, 2022, Early Warning report was made by GIAct Services, which is a company that provides services related to payment and identity fraud prevention. On information and belief, neither Wells Fargo nor Early Warning has informed GIAct Services that all the information in the Wells Fargo account trade line on Patterson's Early Warning report was false and/or that the Wells Fargo account had been opened without Patterson's knowledge.

82. Patterson promptly disputed the Wells Fargo trade line on the Early Warning file disclosure in a written dispute he sent to Early Warning on or about August 3, 2022.

83. On information and belief, Early Warning communicated Patterson's dispute to Wells Fargo, which, in response to Early Warning's communication of Patterson's dispute, verified that the account was fraudulent.

84. In response to Patterson's dispute, Early Warning deleted the Wells Fargo trade line and deleted the reference to Wells Fargo's March 11, 2022, inquiry (a/k/a "credit pull") on a "corrected" Early Warning file disclosure for Patterson, which was dated September 1, 2022.

85. Although Early Warning's deletion of the trade line for the unauthorized Wells Fargo account on Patterson's September 1, 2022 "corrected" Early Warning file disclosure was proper, Early Warning's deletion of the fact that Wells Fargo obtained Plaintiff's Early Warning credit report on March 11, 2022, was not, as it had the effect of concealing the fact that Wells Fargo had impermissibly inquired into Patterson's Early Warning credit report.

86. Early Warning's September 1, 2022 "corrected" file disclosure following Patterson's dispute did not merely delete the Wells Fargo trade line and Wells Fargo's prior inquiry. It also revealed that Early Warning received 13 additional but previously undisclosed formal inquiries from third parties that were not listed on Patterson's August 2022 Early Warning credit report.

87. Based on the publication dates for the inquiries on the September 1, 2022 "corrected" Early Warning file disclosure responding to the Patterson dispute, Wells Fargo and Early Warning falsely reported that Patterson had at least one and up to three recent scheduled ACH transactions returned for insufficient funds to numerous third parties.

**Plaintiff Joshua P. Adams's Experience**

88. On or about July 18, 2023, Adams received a "Wells Fargo Everyday Checking" statement for a checking account ending in 3933.

89. The bank statement Adams received indicated that the beginning balance for the checking account was $195.40 on June 16, 2023, and that the ending balance, after the deduction of a $10.00 Monthly Service Fee, was $185.40 on July 18, 2023.

90. Adams never applied for, opened, and/or held an account with Wells Fargo prior to or while he received the July 18, 2023, checking account statement.

91. Indeed, on information and belief, there is a lack of brick-and-mortar branches owned and/or operated by Wells Fargo where Adams resides, so banking with Wells Fargo would be unreasonably inconvenient for Adams.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

92.  Concerned by his receipt of the checking account statement, Adams called Wells Fargo's customer service number at (800) 869-3557 about one-to-two weeks after receiving the July 18, 2023, checking account statement.

93.  During that call, Adams complained to a Wells Fargo representative about the unauthorized checking account and requested all the account statements associated with it.

94.  Though Adams was denied his request over the phone, he later received a letter from Wells Fargo, dated August 10, 2023, which included alleged statements for the unauthorized Wells Fargo checking account from October 18, 2021, through July 18, 2023.

95.  After reviewing each of the checking account statements, Adams noticed that the first transaction to appear on the account was dated October 20, 2021, with the description "IRS Treas 310 Taxeip3102021xxxxxxxxxx00928 Williams, Latasha" for a total of $1,400.00. Adams does not know a Latasha Williams, nor did Adams authorize the October 20, 2021, transaction.

96.  Adams also noticed several transactions using Zelle in 2022, which he never authorized. For instance, on January 5, 2022, $996.61 was withdrawn through Zelle from Adams's unauthorized checking account from a "Liao Bin," and on January 6, 2022, $377.41 was withdrawn through Zelle from Adams's unauthorized checking account from a "Mullet Sarah." Similarly, on March 29, 2023, $162.33 was withdrawn through Zelle from Adams's checking account from a "Mountain Zol" after two mobile deposits were made to the account on March 28, 2022, and March 29, 2022, respectively.

97.  Concerned that his identity may have been stolen, Adams decided to check his file disclosures with Early Warning, which he received on August 10, 2023, and August 18, 2023, respectively.

98.  The unauthorized Wells Fargo checking account (ending in 3933) appeared on both Early Warning file disclosures and was reported as having been opened on September 21, 2021.

99.  The same account was also reported by Early Warning with a mix of both accurate and inaccurate PII for Adams. Indeed, most of the PII reported by Early Warning was inaccurate. For instance, Early Warning reported information such as Adams's telephone number, email

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

address, driver's license state, number, and expiration date incorrectly. However, only some of the information on the report, such as Adams's residential address and social security number, was reported correctly.

100. Furthermore, Adams's August 10, 2023, and August 18, 2023, Early Warning file disclosures respectively show "WELLS FARGO" and "WELLS FARGO BANK" as having inquired into Adams's credit report on September 21, 2021, and September 22, 2021.

101. On information and belief, the reference to "WELLS FARGO" in the file disclosures refers to Wells Fargo & Co.

102. On information and belief, Wells Fargo inquired into Adams's Early Warning report after Wells Fargo had already opened his unauthorized checking account. This is because the earliest date for the unauthorized account on Adams's Early Warning file disclosures is September 21, 2021; the earliest statement for that account provided by Wells Fargo indicates a beginning balance of $0.00 on September 21, 2021; and Wells Fargo made an inquiry into Adams's Early Warning report on September 21, 2021, and September 22, 2021.

103. Adams never provided Wells Fargo with his PII, nor has Adams authorized Wells Fargo to perform an inquiry into his credit report or Early Warning to report an unauthorized account on his credit report.

**Plaintiff Linda G. Jordan's Experience**

104. On or about November 5, 2021, Jordan received a "Wells Fargo Everyday Checking" statement for an account ending in 1973 that showed a $0.00 balance.

105. Jordan never applied for, opened, and/or held a checking account with Wells Fargo prior to or while she received the November 5, 2021, bank statement.

106. Immediately after receiving the November 2021 bank statement, Jordan called Wells Fargo to report and close the unauthorized checking account.

107. On the call, one of Wells Fargo's representatives informed Jordan that someone may have accessed her personal information, such as social security number, drivers' license number, and

telephone numbers. The Wells Fargo representative also indicated that Wells Fargo would close the unauthorized checking account.

108.    On or about November 12, 2021, Jordan received a letter following up on her call to Wells Fargo. It did not state that the account was closed. In that letter, Wells Fargo indicated that it would restrict the ability to withdraw funds from the account, block deposits and credits to the account, and block automatic or recurring deposits to or payments from the account. The letter also stated that the account was referred for additional investigation.

109.    After receiving the November 12, 2021, letter from Wells Fargo, Jordan took immediate steps to protect her credit. Namely, Jordan purchased Equifax's credit monitoring service for $16.95 per month and requested that Equifax, Experian, and Transunion place a security alert on her credit file.

110.    Jordan also submitted an identity theft affidavit with the Federal Trade Commission on November 13, 2021; a "FRAUD REVIEW OF DRIVER LICENSE/IDENTIFICATION RECORD" form with the California Department of Motor Vehicles on or about November 15, 2021; a request to the Social Security Administration on November 15, 2021, for additional security on her Social Security account; and a police report with the Pleasanton Police Department on November 17, 2021, describing the problems she had experienced with the Wells Fargo checking account, which was opened in her name, using her PII, without her authorization.

111.    Jordan received another letter from Wells Fargo, dated November 24, 2021, indicating that Wells Fargo completed its investigation and determined that Jordan "did not open or have any knowledge of the account(s) with Wells Fargo" and that Wells Fargo "removed any information relating to the account(s) that [it] may have reported."

112.    After receiving the November 24, 2021, letter, Jordan called Wells Fargo again on December 1, 2021, to ask why the unauthorized account was not closed yet. In response, a Wells Fargo representative told Jordan that closure occurs in 30 days, at which point she would receive another letter confirming as such. On the same call, Jordan requested information about the

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

investigation that was conducted per the November 24, 2021, letter, but the Wells Fargo representative refused to provide Jordan with the requested information.

113. On or about December 7, 2021, Jordan received another account statement from Wells Fargo for the same checking account ending in 1973. The statement had the same $0.00 as the November 2021 statement Jordan received.

114. Jordan then received a letter dated December 30, 2021, indicating that Wells Fargo would close the checking account ending in 1973 by January 13, 2022.

115. On or about January 7, 2022, Jordan received another account statement for the checking account showing the same information as the November and December 2021 statements she previously received.

116. Having received various statement from Wells Fargo for an account opened in her name without her permission, Jordan submitted credit freeze requests with Equifax, Experian, and Transunion on or about January 28, 2022.

117. On August 4, 2023, after having become aware of Patterson's case against Wells Fargo and Early Warning, Jordan submitted a request to Early Warning for her credit file disclosure.

118. Early Warning sent Jordan a copy of her credit file disclosure on August 10, 2023. While the disclosure did not list details about the unauthorized Wells Fargo checking account, it did list two inquiries from "WELLS FARGO" and "WELLS FARGO BANK" on October 16, 2021, and October 19, 2021, respectively, even though Wells Fargo stated that it "removed any information relating to the account(s) that [it] may have reported" as early as November 24, 2021.

119. On information and belief, the reference to "WELLS FARGO" in the file disclosure refers to Wells Fargo & Co.

120. On information and belief, Wells Fargo inquired into Jordan's Early Warning consumer report after Wells Fargo had already opened her unauthorized checking account. While the exact date on which Jordan's unauthorized account is unknown, the November 5, 2021, statement for that

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

account indicates a beginning balance on October 15, 2021, meaning that the account must have been opened prior to Wells Fargo's first inquiry on October 16, 2021.

121.   The same Early Warning file disclosure listed other inquiries postdating those made by Wells Fargo, including an inquiry by Capital One on April 6, 2023, and an inquiry by GEICO on August 7, 2023.

122.   Jordan never provided Wells Fargo with her PII, nor has Jordan authorized Wells Fargo to inquire about her credit.

### Plaintiffs' and the Class's Collective Experience

123.   As made evident by Plaintiffs' Early Warning file disclosures, Early Warning possesses detailed account information and account status information for every reported consumer or business bank account associated with the consumer. This includes the bank name, bank routing number, account number, account open date, current account balance and status, previous account balances, date of last status change, and account status history. If the consumer has had any transactions refused due to insufficient funds, these are also reported by Early Warning, as well as dates, amounts, and recipient banks for all payments from each of the consumer's bank accounts. Further, Early Warning file disclosures include an inquiry activity report indicating a third party has made a request for a consumer's report.

124.   For each consumer or business bank account, Early Warning also possesses detailed PII for the consumer, including their name, phone number, address, social security number, date of birth, email addresses, and in some cases, the form of identification reviewed by the bank, including the consumer's driver's license number, issuing state, and expiration date.

125.   Early Warning impermissibly allowed Wells Fargo to request and obtain Plaintiffs' and putative class members' Early Warning credit reports which, on information and belief, contain confidential PII and PFI, such as account owner information, account status history, and deposit transactions.[12]

126.   Plaintiffs have been injured by Defendants' false credit reporting and impermissible inquiries.

---

[12] https://www.earlywarning.com/sites/default/files/2022-04/Verify-Identity_ProductBrief_DIGITAL_20220408-1.pdf (last accessed July 9, 2024).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

127.   Plaintiffs have been injured by Defendants' theft of their PII and PFI.

128.   On information and belief, Wells Fargo furnished, and Early Warning published false trade line information regarding one or more unauthorized accounts Wells Fargo opened in Plaintiffs' and the putative class members' names.

129.   Now Plaintiffs and class members must incur the cost of protecting themselves against identity theft and fraud. Defendants should bear that cost.

130.   Plaintiffs experienced great stress, personal inconvenience, and expenses as a consequence of Defendants' actions as described herein.

131.   Wells Fargo's actions placed Plaintiffs at risk of prosecution and exposure to criminal liability for money laundering, as Wells Fargo transferred money in Plaintiffs' names to third parties without Plaintiffs' knowledge or consent.

132.   Defendants' actions also placed Plaintiffs at great risk of false and/or incorrect credit reporting, which affected their credit standing and financial well-being.  Plaintiffs are also at great risk of identity theft and/or unauthorized publication and dissemination of their PII.

**CFPB Complaints Reveal Many Other Victims**

133.   Defendants' conduct is not limited to Plaintiffs. The complaint database the Consumer Financial Protection Bureau maintains for consumer complaints reveals more than fifty other consumers with complaints about unauthorized accounts Wells Fargo opened in consumers' names through identity fraud - in just March through June of 2022.

134.   Wells Fargo responded to each of the consumer complaints through the CFPB, but Wells Fargo did not comment publicly as to any allegation that it opened any unauthorized account in the name of any of the CFPB complainants. *See* **Appendix A**, list of CFPB complaints about Wells Fargo opening unauthorized consumer banking accounts.

135.   Searching for similar complaints filed by consumers with the CFPB alleging similar misconduct by other financial institutions reveals that Wells Fargo has received substantially more complaints on this issue during the same time period than any other major U.S. bank.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

136.    Some of the complaints in Appendix A relating to the use of a mix of correct and incorrect PII to open bank accounts include those made by: (i) a consumer in Louisiana on May 31, 2022 (CFPB Compliant No. 5617659) noting that the name, social security number, email address and mailing address were correct but the driver's license and mobile phone number were incorrect; (ii) a consumer in a consumer in Michigan on April 26, 2022 (CFPB Complaint No. 5501400) noting a correct name, address and social security number, but an incorrect phone number and email address; (iii) a consumer in Florida on March 31, 2022 (CFPB Complaint No. 5388244) noting a correct but old email address and an incorrect email address, mailing address, phone number and job description and title; and (iv) a consumer in New Jersey on March 29, 2022 (CFPB Complaint No. 5382897) noting a correct social security number, driver's license number, and date of birth, but an incorrect driver's license expiration date.

## Wells Fargo's History of Abusing Consumers

137.    Wells Fargo has a long history of engaging in practices that are harmful to consumers. Specifically, Wells Fargo has entered into a number of consent orders and settlements with the Consumer Financial Protection Bureau ("CFPB"), the Federal Trade Commission ("FTC"), Office of the Comptroller of the Currency ("OCC"), and other regulatory agencies.

138.    In 2015, the OCC found deficiencies in Wells Fargo's internal controls related to the Bank Secrecy Act and Anti-Money Laundering rules in the Wholesale Banking Group. The consent order noted that Wells Fargo had not made acceptable progress toward correcting previously identified problems in this area. In the Matter of Wells Fargo Bank, N.A., OCC AA-EC-2015-79 (Nov. 19, 2015).

139.    In 2016, Wells Fargo also entered into settlements with the CFPB, OCC, and the City of Los Angeles in the combined amount of $185 million for Wells Fargo's practice of opening unauthorized deposit and credit accounts without the customer's knowledge.  Wells Fargo also entered into a $142 million settlement with account holders regarding this practice.  *See Jabbari v. Farmer*, No. 18-16213, No. 18-16236, No. 18-12684, No. 18-12685, No. 18-16315, No. 18-

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

16317, 2020 WL 4048683 (9th Cir. July 20, 2020) (overruling objections to approval of class action settlement).

140.   In April 2018, Wells Fargo entered into agreements with the OCC and the CFPB totaling $1 billion for Wells Fargo's practices relating to forcing customers to pay for interest rate lock extensions when the bank caused delays and forced customers to purchase unnecessary insurance policies when purchasing vehicles with loans from Wells Fargo.  That same year, Wells Fargo refunded millions of dollars in fees for add-on products such as pet insurance and legal services that were placed on customers' accounts without their full understanding. In the Matter of Wells Fargo Bank, N.A., CFPB 2018-BCFP-0001 (April 20, 2018); OCC AA-EC-2018-16 (April 20, 2018).

141.   In December 2018, Wells Fargo agreed to pay $575 million to resolve claims with the 50 states and the District of Columbia relating to Wells Fargo's practice of opening accounts without consumer consent, force-placing collision insurance on auto loans, and charging excessive fees to mortgage borrowers for extending a rate lock.[13]

142.   In February 2020, Wells Fargo agreed to pay $3 billion to resolve its potential civil and criminal liability stemming from Department of Justice allegations that it engaged in a years-long process of pressuring employees to meet unrealistic sales goals that led to the creation of thousands of fake accounts.  In connection with the settlement, Wells Fargo admitted that it collected millions of dollars in fees and interest to which it was not entitled, harmed certain customers' credit, and unlawfully misused customers' personal information.[14]

\\

\\

---

[13] NAT'L ASS'N OF ATTORNEYS GENERAL, Wells Fargo Multistate Settlement Agreement (Dec. 28, 2018), https://www.naag.org/wp-content/uploads/2021/10/654-2018.12.28-Multistate-Wells-Fargo-Settlement-Agreement.pdf.

[14] DEP'T OF JUSTICE, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization (Feb. 21, 2020), https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

**Defendants' Awareness of the Harmfulness and**

**Prevalence of Synthetic Identity Fraud**

143.   Federal banking laws require financial institutions to maintain and follow robust procedures for identifying the identity of prospective bank customers, which are known as "KYC" (know your customer) and "AML" (anti-money laundering) requirements. These requirements are embodied in statutes and other federal rules and regulations.

144.   Banks' and credit reporting agencies' identity verification processes and procedures represent a critical first line of defense against a particularly pervasive form of identity fraud known in the financial services community as "synthetic identity fraud."

145.   Synthetic identity fraud, generally, is the fraudulent use of some of a consumer's true personal identification information in combination with some false personal identification information in order to open financial accounts in the consumer's name without the consumer's knowledge or consent. Typically, synthetic identity fraudsters use these unauthorized accounts for various criminal purposes, including (among other things) money laundering, theft from the victim's legitimate financial accounts, and opening credit accounts in the victim's name, which can be used to make fraudulent purchases without the victim's knowledge or consent.

146.   Early Warning has long been aware of the dangers posed by synthetic identity fraud, and Early Warning's website contains multiple articles about the threat posed by synthetic identity fraud to financial institutions and consumers alike, which Early Warning uses to market its information security and fraud prevention business to financial institutions and other businesses that regularly manage sensitive consumer PII and PFI.[15]

---

[15] *A Perfect Storm of Identity Fraud is On the Horizon*, EARLY WARNING (May 23, 2016), https://www.earlywarning.com/blog/perfect-storm-identity-fraud-horizon; *Application Fraud: Understanding and Addressing the Challenge*, EARLY WARNING (Feb. 14, 2019), https://www.earlywarning.com/blog/application-fraud-understanding-and-addressing-challenge; *Winning the Fight Against Application Fraud: How to Mitigate Risk and Onboard More Costumers*, EARLY WARNING (May 11, 2021), https://www.earlywarning.com/blog/winning-fight-against-application-fraud-how-mitigate-risk-and-onboard-more-customers; *Are Some of Your Customers Fake? Grappling with Synthetic Identity Fraud*, EARLY WARNING (Jan. 5, 2022), https://www.earlywarning.com/blog/are-some-your-customers-fake-grappling-synthetic-identity-fraud; Robin Love, *The Best Way to Prevent Synthetic Identity Fraud? Focus on Application Fraud*,

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

147.   Because it has such detailed PII for practically every American consumer's personal and business banking accounts, Early Warning should easily be able to recognize inconsistencies in PII submitted by financial institutions seeking information about consumers.

148.   Given the false PII Wells Fargo associated with Plaintiffs' and the other putative class members' unauthorized accounts, it was unreasonable per se for Early Warning to honor Wells Fargo's inquiries in connection with the opening of the unauthorized accounts.

149.   Early Warning also reported false transaction and PII regarding Patterson in connection with the trade lines Wells Fargo furnished to Early Warning for the unauthorized Patterson account, which, on information and belief, Early Warning published several times.

150.   Similarly, Early Warning allowed Wells Fargo to impermissibly inquire into Jordan's credit report (and, on information and believe, the PII and PFI therein) without Jordan's knowledge or prior authorization. On information and belief, Early Warning then published the fact that Wells Fargo inquired into Jordan's credit report, despite Wells Fargo not having a permissible purpose in doing so, to third parties who later inquired into Jordan's credit report.

151.   On information and belief, Wells Fargo failed to follow industry standards for identity verification when it opened Plaintiffs' unauthorized accounts, including: (1) failing to use appropriate identity proofing methods, such as behavioral scores and capturing information about the device used during the online or mobile application process that resulted in Wells Fargo's opening of the unauthorized accounts; (2) failing to verify the opening deposit; and (3) requiring less information to verify Plaintiffs' identities than they require consumers to provide in order to obtain their own consumer file.

152.   On information and belief, Wells Fargo failed to follow industry standards when it inquired into Plaintiffs' Early Warning credit reports without Plaintiffs' consent and without a permissible purpose, as Wells Fargo was already put on notice by LNRS of inaccuracies with Plaintiffs' PII before it inquired into said credit reports. Wells Fargo also failed to follow industry standards

---

EARLY WARNING, https://www.earlywarning.com/blog/best-way-prevent-synthetic-identity-fraud-focus-application-fraud (last accessed Nov. 6, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

for credit furnishing when it furnished inaccurate PII and PFI about Plaintiffs to Early Warning despite being on notice of said inaccuracies.

153. On information and belief, Early Warning also failed to follow industry standards for credit reporting since it reported inaccurate and/or inconsistent PII yet failed to make corrections even after having been put on notice of said inaccuracies and/or inconsistencies.

154. Wells Fargo utilizes LNRS's services for fraudulent verification of consumers' identities when Wells Fargo creates consumer checking accounts. This "verification" lends fraudulently opened accounts a false veneer of legitimacy.

155. Then, once an unauthorized account has already been opened in the consumer victim's name, Early Warning allows Wells Fargo to improperly inquire into consumers' credit reports. Early Warning further allows Wells Fargo to request and obtain consumers' confidential and personal Early Warning credit report.

156. Consumers' confidential PII and PFI is inherently valuable.[16] This is one reason data breaches have proliferated – the data stolen in these breaches is often available for purchase on the "dark web" and other sources.

157. By obtaining this confidential personal identification and banking information without the consumers' permission or even their knowledge, Wells Fargo is injuring unwitting consumers.

**Class Allegations**

**With the assistance of EWS, WFB and WFC have opened unauthorized bank accounts for Plaintiffs and the putative class members.**

158. WFB has processed unauthorized electronic financial transactions using unauthorized accounts opened in Patterson's and Adams's names.

159. Defendants Wells Fargo and Early Warning have also knowingly and willfully furnished and published false and defamatory trade line information regarding Plaintiffs and the other putative

---

[16] While difficult to quantify, it is estimated that data collected from consumers each year is worth over $185 billion. José Bayoán Santiago Calderón & Dylan G. Rassier, *Valuing the U.S. Data Economy Using Machine Learning and Online Job Postings*, U.S. Bureau Econ. Analysis, Working Paper No. 2022-13, 2022), https://www.bea.gov/system/files/papers/BEA-WP2022-13.pdf.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

class members, have inquired into Plaintiffs' and putative class members' credit files without a permissible purpose, and/or have authorized impermissible inquiries into Plaintiffs' and putative class members' credit reports. As a result of Defendants' misconduct, Plaintiffs and the putative class members have suffered reputational injuries and other actual harms and losses.

160. Plaintiffs are members of and seek to represent the following Class:

> All persons within the United States who have or had an unauthorized bank account that was opened by Wells Fargo in connection with Defendants' verification of the person's identity based on an "application" that included a combination of some of the person's true and false PII, within the four years prior to the filing of the complaint in this action.

161. Plaintiffs are members of and seek to represent the following FCRA Subclass:

> All persons within the United States whose credit report and/or consumer disclosure from Early Warning was obtained by Wells Fargo without authorization.

162. Plaintiff Jordan is a member of and seeks to represent the following CCRAA Subclass:

> All persons within California whose credit report and/or consumer disclosure from Early Warning was obtained by Wells Fargo without authorization as a result of Wells Fargo opening an unauthorized account in their name using a mix of true and false PII.

163. Together, the Class, FCRA Subclass, and CCRAA Subclass are collectively referred to as the "Classes," and the FCRA Subclass and CCRAA Subclass, together, are referred to as the "Subclasses."

164. Excluded from the Class and Subclasses are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and Defendants' legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injury as a result of the facts alleged herein.

165. Plaintiffs bring this lawsuit as a class action on behalf of themselves and class members of the proposed Classes. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

166. <u>Numerosity</u>: the members of the Class and Subclasses are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Classes is currently unknown to Plaintiffs at this time; however, given that, on information and belief, Defendants' conduct resulted in thousands of unauthorized bank accounts being opened and thousands of impermissible credit inquiries with respect to each class member across the country during the class period, it is reasonable to presume that the members of the Classes are so numerous that joinder of all class members is impracticable.

167. For example, during just the four-month period of March through June of 2022, Wells Fargo was the subject of more than 40 unique consumer complaints filed with the CFPB alleging that Wells Fargo opened an unauthorized bank account in the name of the complaining consumer when the consumer had no pre-existing banking relationship with Wells Fargo at the time the account was opened. The number of CFPB complaints Wells Fargo received with respect to this specific fact pattern far outnumbered the number of similar complaints filed with the CFPB that were lodged against any other financial institution during the same period.

168. <u>Commonality</u>: there are common questions of law and fact as to class members that predominate over questions affecting only individual members, including, but not limited to:

- Whether Wells Fargo obtained class members' authorization to use or obtain class members' credit reports from Early Warning;
- Whether Early Warning had reason to believe that Wells Fargo lacked a legitimate business purpose for obtaining the class members' credit reports at the time Early Warning provided those reports to Wells Fargo;
- Whether Wells Fargo obtains access to class members' credit reports in connection with any transaction involving the extension of credit to or opening of account for class members;
- Whether within the statutory period, Wells Fargo obtained or used class members' credit reports for a purpose not enumerated by the FCRA;
- Whether, within the statutory period, Early Warning provided class members' credit reports to Wells Fargo for a purpose not enumerated by the FCRA;
- Whether, within the statutory period, Early Warning provided class members' credit reports to Wells Fargo in spite of the fact that the identity verification information associated with the consumers' unauthorized Wells Fargo accounts was materially inconsistent with the information Early Warning associated with such consumers' legitimate accounts that were included in Early Warning's reports for such consumers;

- Whether Wells Fargo retained the confidential PII and PFI contained in the credit reports it obtained from Early Warning regarding class members despite having no legitimate business relationship with the class members;
- Whether Plaintiffs and class members were damaged thereby, and the extent of damages for such violations; and
- Whether an injunction should issue with respect to Defendants:
  - Requiring Defendants to:
    - delete all unlawfully obtained consumer credit information that each Defendant obtained as a consequence of Wells Fargo's opening of unauthorized consumer bank accounts for Plaintiffs and the class members;
    - jointly and severally ensure that the Plaintiffs and class members' credit reports do not contain any information pertaining to any unauthorized account(s) Wells Fargo opened in Plaintiffs' or any class member's name;
    - each separately communicate to Plaintiffs and each of the class members the name and contact information belonging to every person or entity to whom the Defendants provided information regarding or relating to the unauthorized account Wells Fargo opened in the Plaintiffs' or class members' names, as well as the date(s) on which each Defendant provided the relevant information, and the information Defendants provided to such person or entity;
    - each separately inform every person or entity to whom the Defendants provided information regarding or related to each unauthorized account Wells Fargo opened in Plaintiffs' or any other class member's name that (a) each account (which shall be identified specifically) was not authorized or opened by said Plaintiffs or class member in whose name it was opened; (b) the opening of each account was the result of a fraud that Defendants failed to detect and prevent (identifying the specific fraudulent information that Defendants received regarding each Plaintiff or class member in connection with the unauthorized account application); and confirming that, as far as Defendants are aware, each Plaintiff or class member had no knowledge of and took no part in the fraudulent opening of the account, and
  - Prohibiting Defendants from:
    - opening any new consumer checking account for any individual who is not a pre-existing banking customer of the Wells Fargo until this Court certifies that Defendants have developed and implemented processes and procedures that would have prevented the unauthorized opening of Plaintiffs' and the class members' accounts based on the information Defendants collected regarding Plaintiffs and the class members prior to opening the Plaintiffs' and class members' unauthorized accounts.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

172.   <u>Typicality</u>: Plaintiffs, who are natural persons, are asserting claims that are typical of the Class and Subclasses, as Plaintiffs (i) had a bank account opened by Wells Fargo without authorization in connection with Wells Fargo's purported verification of Plaintiffs' identity involving some of the Plaintiffs' true and false PII, (ii) Plaintiffs' PII and PFI was obtained by Wells Fargo without Plaintiffs' authorization, and (iii) Early Warning provided Wells Fargo with access to, and Wells Fargo inquired into, Plaintiffs' credit reports without a permissible purpose.

173.   <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses in that Plaintiffs have no interests antagonistic to any member of the Class and Subclasses. Plaintiffs have retained counsel experienced in handling individual and class action claims involving consumer rights similar to those implicated here.

174.   Valuing Plaintiffs' / the class members' claims mechanically is feasible by reference to applicable credit market opportunity, available equity (unencumbered property value minus loan balance), cost of credit protection measures (in time and expense), correction of prior false reporting to third parties, and "market" value of the PII and PFI that Wells Fargo unlawfully obtained through this scheme.

175.   A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with state and federal law. The interest of class members in individually controlling the prosecution of separate claims against the Defendants is small because the maximum statutory damages in an individual action are minimal.

176.   Defendants have acted and continue to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class and Subclasses as a whole.

177.   Plaintiffs reserve the right to redefine the Class and Subclasses as well as assert additional sub-classes as appropriate based on discovery and specific theories of liability.

\\

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

# VI. CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FAIR CREDIT REPORTING ACT

### (On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Wells Fargo)

178.  Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

179.  Plaintiffs and each putative Class and FCRA Subclass member is a "consumer," as that term is defined by the FCRA.

180.  Wells Fargo is a "person" and a "user" of consumer credit and other financial information as those terms are defined by the FCRA.

181.  The Early Warning reports obtained by Wells Fargo are "consumer report[s]" as defined by the FCRA.

182.  As alleged above, Wells Fargo willfully accessed portions or all of Plaintiffs' consumer credit reports under false pretenses or knowingly without a permissible purpose and has failed to comply with 15 U.S.C. § 1681b(f) as part of their synthetic identity fraud scheme.

183.  In the alternative only, Wells Fargo negligently accessed portions or all of Plaintiffs' consumer credit reports without a permissible purpose and has failed to comply with 15 U.S.C. § 1681b(f).

184.  Plaintiffs were not Wells Fargo customers and did not authorize Wells Fargo to access their Early Warning reports. Wells Fargo's impermissible access to and use of Plaintiffs' private financial information held in their Early Warning reports, when Wells Fargo had knowledge that it had no legally permissible purpose to access and use that information, constitutes knowing and willful violations of the FCRA under 15 U.S.C. § 1681n, or alternatively and at a minimum, negligent violations under 15 U.S.C. § 1681o.

185.  Wells Fargo had no intention to use the information in Plaintiffs' credit reports (a) in connection with a credit transaction involving Plaintiffs because the unauthorized accounts were consumer checking accounts; (b) for employment purposes because Plaintiffs have not sought employment with Wells Fargo; (c) in connection with underwriting insurance because, on information and belief, Wells Fargo is a bank and not an insurance company; (d) in connection

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

with a determination of eligibility for a license or other government benefit because Wells Fargo is a private entity; (e) in connection with a valuation of, or assessment of the credit prepayment risk associated with, an existing credit obligation because, again, the unauthorized accounts at issue were consumer checking accounts; or (g) as an executive department and agency in connection with the issuance of government-sponsored individually-billed travel charge cards because Wells Fargo is a private banking entity.

186. Furthermore, Wells Fargo could not have had a permissible purpose in accessing Plaintiffs' credit reports because it already attempted to verify Plaintiffs' identities with LNRS and opened consumer checking accounts in Plaintiffs' names shortly before it inquired into Plaintiffs' respective Early Warning credit reports.

187. Pursuant to 15 U.S.C. §§ 1681n and/or 1681o, Wells Fargo is liable to Plaintiffs, the Class, and FCRA Subclass for their actual or statutory damages, attorneys' fees and costs, and punitive damages.

188. Plaintiffs, the Class, and FCRA Subclass have suffered actual damages, and have suffered reputational damage, distress and embarrassment, and concern that improper inquiry and/or inaccurate reporting could recur as a result of Wells Fargo's willful violations of the FCRA.

189. Specifically, Plaintiffs', the Class's, and FCRA Subclass's PII has been stolen and Plaintiffs', the Class's, and FCRA Subclass's privacy has been invaded.

190. Plaintiffs, the Class, and FCRA Subclass have experienced significant stress and frustration as a result of the unauthorized pulls of their Early Warning reports by Wells Fargo.

191. The injuries suffered by Plaintiffs, the Class, and FCRA Subclass because of Wells Fargo's impermissible access to and use of Plaintiffs', the Class's, and FCRA Subclass's Early Warning reports were attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Plaintiffs to punitive damages under 15 U.S.C. § 1681n(a)(2).

\\

\\

\\

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

# COUNT II

## VIOLATION OF THE FAIR CREDIT REPORTING ACT

### (On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Early Warning)

192. Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

193. Plaintiffs, the Class, and FCRA Subclass are "consumer[s]," as that term is defined by the FCRA.

194. Early Warning is a "consumer reporting agency" as that term is defined by the FCRA.

195. As alleged above, Early Warning provided Wells Fargo credit reports despite the fact that Plaintiffs, the Class, and FCRA Subclass did not authorize Early Warning to provide the reports, and Wells Fargo had no permissible purpose for obtaining the reports.

196. The PII provided by Wells Fargo did not match the PII Early Warning had on file for Plaintiffs, the Class, and FCRA Subclass, yet Early Warning still provided Plaintiffs', the Class's, and FCRA Subclass's Early Warning credit reports to Wells Fargo.

197. For instance, Early Warning had no reason to believe it was furnishing information in response to the order of a court. 15 U.S.C. § 1681b(a)(1).

198. Further, none of the Plaintiffs provided Early Warning with written instructions to furnish a consumer report to Wells Fargo pursuant to 15 U.S.C. § 1681b(a)(2).

199. Similarly, Early Warning had no reason to believe that Wells Fargo (a) intended to use information in Plaintiffs' credit reports in connection with a credit transaction involving Plaintiffs since the unauthorized accounts were consumer checking accounts; (b) intended to use the information for employment purposes since Plaintiffs have not sought employment with Wells Fargo; (c) intended to use the information in connection with underwriting insurance since, on information and belief, Wells Fargo is a bank and not an insurance company; (d) intended to use the information in connection with a determination of eligibility for a license or other government benefit since Wells Fargo is a private entity; (e) intended to use the information in connection with a valuation of, or assessment of the credit prepayment risk associated with, an existing credit obligation because, again, the unauthorized accounts at issue

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

were consumer checking accounts; or (g) intended to use the information as an executive department and agency in connection with the issuance of government-sponsored individually-billed travel charge cards because Wells Fargo is a private banking entity. 15 U.S.C. §§ 1681b(a)(3)(A)-(E), (G).

200.   Indeed, Early Warning could not have otherwise believed that Wells Fargo had a legitimate business need for the information in Plaintiffs' and other putative class members' credit reports because the PII associated with the unauthorized Wells Fargo accounts was inconsistent with the PII Early Warning already had on file for Plaintiffs.

201.   Moreover, Early Warning could not have otherwise believed that Wells Fargo had a legitimate business need for the information in Plaintiffs' and other putative class members' credit reports because, at least with respect to Plaintiffs', Wells Fargo inquired into their respective Early Warning reports with inaccurate PII mere shortly *after* the unauthorized consumer accounts were already opened.

202.   As such, Early Warning should have known that Wells Fargo could not have had a legitimate business need for the information in connection with a business transaction initiated by the consumer since Wells Fargo submitted information to Early Warning it knew was inaccurate, and the accounts at issue were just opened, meaning that there was no need for Wells Fargo to "determine whether the consumer continues to meet the terms of the account." 15 U.S.C. § 1681b(a)(3)(F).

203.   Therefore, Early Warning has failed to comply with the requirements of 15 U.S.C. § 1681b(a).

204.   Plaintiffs, the Class, and FCRA Subclass were not Wells Fargo customers and did not authorize Early Warning to publish their reports to Wells Fargo, and there was no permissible reason for Early Warning to provide Wells Fargo with Plaintiffs', the Class's, and FCRA Subclass's reports.  Early Warning's unauthorized publication to Wells Fargo of Plaintiffs', the Class's, and FCRA Subclass's reports constitutes knowing and willful violations of the FCRA under 15 U.S.C. § 1681n, or alternatively and at a minimum, negligent violations under 15 U.S.C. § 1681o.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

205. Further, on information and belief, Early Warning furnished its record of inquiries for Plaintiffs, the Class, and FCRA Subclass, including the impermissible inquiries by Wells Fargo, to third parties to be used in determining credit eligibility and/or credit standing.

206. Pursuant to 15 U.S.C. §§ 1681n and/or 1681o, Early Warning are liable to Plaintiffs, the Class, and FCRA Subclass for their actual or statutory damages, attorneys' fees and costs, and punitive damages.

207. Plaintiffs, the Class, and FCRA Subclass have suffered actual damages, and have suffered reputational damage, distress and embarrassment, and concern that improper inquiry and/or inaccurate reporting could recur as a result of Early Warning's willful violations of the FCRA.

208. Specifically, Plaintiffs', the Class's, and FCRA Subclass's personal identifiable information has been stolen, and Plaintiffs', the Class's, and FCRA Subclass's privacy has been invaded. Further, as a result of the unauthorized publication, Wells Fargo provided false information about Plaintiffs, the Class, and FCRA Subclass that appeared on their reports that caused reputational damage.

209. Plaintiffs, the Class, and FCRA Subclass have also experienced significant emotional distress and frustration as a result of the unauthorized publication.

210. Plaintiffs, the Class, and FCRA Subclass have also been damaged in connection with Early Warning's unauthorized publication of their reports to Wells Fargo.

211. The injuries suffered by Plaintiffs, the Class, and FCRA Subclass because of Early Warning's unauthorized publication of their credit reports to Wells Fargo were attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Plaintiffs, the Class, and FCRA Subclass to punitive damages under 15 U.S.C. § 1681n(a)(2).

### COUNT III

### VIOLATION OF THE FAIR CREDIT REPORTING ACT

### (On Behalf of Plaintiffs, the Class, and FCRA Subclass Against Early Warning)

212. Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

213.   Plaintiffs, the Class, and FCRA Subclass are "consumer[s]," as that term is defined by the FCRA.

214.   As a consumer reporting agency under the FCRA, Early Warning has statutory obligations to use reasonable procedures to ensure the maximum possible accuracy of their reports. 15 U.S.C. 1681e(b).

215.   Early Warning's conduct, as alleged above, demonstrates Early Warning has failed to establish or follow reasonable procedures to assure maximum possible accuracy of consumer reports in violation of 15 U.S.C. § 1681e(b).

216.   As a result of Early Warning's misconduct, Plaintiffs and putative class members suffered damages to their reputations, been victims of fraud, subjected to increased risk of credit denial, and other concrete actual harm.

217.   Early Warning's violations of 15 U.S.C. 1681e(b) were willful, rendering them liable pursuant to 15 U.S.C. 1681n. In the alternative, Early Warning was negligent, entitling Plaintiffs to recover under 15 U.S.C. 1681o.

218.   Plaintiffs and the putative class members are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n.

**COUNT IV**

**THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT**

**(On Behalf of Jordan and CCRAA Subclass Against Wells Fargo and Early Warning)**

219.   Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

220.   Jordan is a consumer as the term is defined by California Civil Code § 1785.3(b).

221.   Defendants are "persons" as the term is defined in California Civil Code § 1785.3(l).

222.   Under California law, liability can be attached to any "person who knowingly and willfully obtains access to a file other than as provided in Section 1785.11[and/or] knowingly and willfully obtains data from a file other than as provided in Section 1785.11 . . .." California Civil Code § 1785.19(a)(1)-(2).

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

223. There are several permissible purposes for which a person or entity may gain access to a consumer's credit report. Such permissible purposes include, but are not limited to, (a) gaining access to a consumer's credit file "[i]n accordance with the written instructions of the consumer to whom it relates[;]" (b) providing access to someone a consumer credit reporting agency believes "[i]ntends to use the information in connection with a credit transaction;" and (c) providing access to someone a consumer credit reporting agency believes "[o]therwise has a legitimate business need for the information in connection with a business transaction involving the consumer." California Civil Code § 1785.11(a)(2)-(3)(A), (F).

224. Additionally, except under limited circumstances, "a consumer credit reporting agency shall not furnish to any person a record of inquiries solely resulting from credit transactions that are not initiated by the consumer." California Civil Code § 1785.11(c).

225. Jordan accessed her file disclosure from Early Warning on August 4, 2023, which revealed that Wells Fargo inquired into Jordan's Early Warning credit report on October 16, 2021, and October 19, 2021, respectively, despite receiving reassurance from Wells Fargo that it had removed inaccuracies from Jordan's credit file.

226. Jordan never authorized Wells Fargo, in writing or otherwise, to access her Early Warning credit report because, as explained above, Jordan has never applied for, opened, or held any account with Wells Fargo.

227. Early Warning had no reason to believe that Wells Fargo "[i]ntend[ed] to use the information [in Jordan's and other putative class members' reports] in connection with a credit transaction" because Wells Fargo had already opened consumer checking accounts in Jordan's and other putative class members' names and, on information and belief, already attempted to verify Jordan's identity with LNRS.

228. Early Warning could not have otherwise believed that Wells Fargo had a legitimate business need for the information in Plaintiffs' and other putative class members' credit reports because the PII associated with the unauthorized Wells Fargo accounts was inconsistent with the PII Early Warning already had on file for Plaintiffs.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

229.   Jordan's Early Warning report further reflected other credit inquiries from entities other than Wells Fargo which postdated Wells Fargo's credit inquiries, i.e., an inquiry from Capital One on April 6, 2023, and GEICO on August 7, 2023.

230.   On information and belief, Early Warning furnished its record of inquiries for Jordan, including the impermissible inquiries from Wells Fargo, to both Capital One and GEICO.

231.   Jordan and the CCRAA Subclass suffered damages as a result of Defendants' conduct.

232.   Defendants have demonstrated willful violations of the CCRAA in that (a) Wells Fargo inquired into Jordan's and the CCRAA Subclass's Early Warning credit reports despite knowing that it had no permissible purpose in doing so and (b) Early Warning continues to report Wells Fargo's inquires despite knowing that Wells Fargo had no permissible purpose in making those inquiries in the first place.

233.   For instance, in Jordan's case, Early Warning continued to report Wells Fargo's inquiries after Wells Fargo had informed Jordan that it removed information related to the unauthorized account that was opened in her name.

234.   Alternatively, Defendants' conduct was negligent. First, Wells Fargo owed a statutory duty to Jordan and the CCRAA Subclass of not inquiring into their credit reports without a permissible purpose. Wells Fargo breached that duty by nevertheless inquiring into Jordan's and the CCRAA Subclass's Early Warning credit reports without a permissible purpose. Jordan and the CCRAA Subclass were then harmed by Wells Fargo's inquiries because Wells Fargo accessed sensitive PII and PFI without their permission, thereby invading their privacy. Wells Fargo's breach was the proximate and but-for cause of Jordan's and the CCRAA Subclass's injuries.

235.   Second, Early Warning owed statutory duties to Jordan and the CCRAA Subclass of (a) not allowing Wells Fargo to access their credit reports without a permissible purpose and (b) not furnishing to any person a record of inquiries solely resulting from credit transactions that are not initiated by the consumer. Early Warning breached those duties by (a) granting Wells Fargo access to Jordan's and the CCRAA Subclass members' credit reports and (b) furnishing to

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Capital One and GEICO a record of inquiries solely resulting from credit transactions that were not initiated by Jordan and the CCRAA Subclass members.

236. Consequently, Jordan and the CCRAA Subclass are entitled actual damages, punitive damages of no less than $2,500 and no more than $5,000 per violation, reasonable attorneys' fees and costs, injunctive relief, and any other relief that the Court deems proper.

### VII.  REQUEST FOR DECLARATORY RELIEF

237. Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

238. As outlined in the preceding counts and the preceding factual allegations, Defendants have violated the FCRA and CCRAA.

239. Plaintiffs seek a declaration that Defendants' conduct as described herein violates the FCRA and CCRAA.

### VIII.  REQUEST FOR INJUNCTIVE RELIEF

240. Plaintiffs repeat and reallege the allegations in this Second Amended Complaint.

241. To the extent monetary remedies are in some ways inherently inadequate in circumstances involving identity theft, and to the extent that Wells Fargo continues to retain and have access to the use of Plaintiffs' and the putative class members' personal identification and banking history information, Wells Fargo should also be enjoined from the use, publication, transfer, or sale of any personal or other information regarding Plaintiffs or any putative class member for any purpose whatsoever and instructed to completely and permanently delete and destroy all electronic and physical copies of Plaintiffs' and the putative class members' personal identification and banking information, and to notify every entity that made inquiry to Early Warning regarding Plaintiffs or any class member at a time when Early Warning included trade line information Wells Fargo furnished regarding an unauthorized Wells Fargo account opened by Wells Fargo as a result of synthetic identity fraud, that all of the information Wells Fargo furnished to and published by Early Warning to such inquiring party regarding Wells Fargo's unauthorized account in the name of Plaintiffs or any putative class member was false.

\\

# IX. PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the putative class members, pray that the Court grant Plaintiffs the following relief against Defendants and each of them:

- that this action be certified as a class action;
- that Plaintiffs be appointed as the representatives of the Classes;
- that Plaintiffs' attorneys be appointed Class Counsel;
- actual damages
- statutory damages;
- punitive damages;
- declaratory relief;
- injunctive relief;
- costs of suit;
- reasonable attorneys' fees;
- and all such other and further relief as the Court deems just and proper in light of Defendants' misconduct and Plaintiffs' and the putative class members' injuries alleged herein.

# X. TRIAL BY JURY

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiffs are entitled to and demand a trial by jury.

Respectfully submitted,

*/s/ Abbas Kazerounian, Esq.*
Abbas Kazerounian, Esq. (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Ave, Suite D1
Costa Mesa, CA 92626
ak@kazlg.com
Telephone:    (800) 400-6808
Facsimile:    (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Suite D1

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT

Costa Mesa, California 92626
Telephone:      (800) 400-6808
Facsimile:      (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone:      (800) 400-6808
Facsimile:      (800) 520-5523

*/s/ Theodore ("Thad") O. Bartholow, III*
Theodore ("Thad") O. Bartholow III
Texas State Bar No. 24062602
(*Pro Hac Vice*)
KELLETT & BARTHOLOW PLLC
11300 N. Central Expressway, Suite 301
Dallas, TX 75243
Tel.: (214) 696-9000
Fax: (214) 696-9001
thad@kblawtx.com

*Attorneys for Plaintiff Bernard J. Patterson*

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 3:23-cv-03858-TLT